# United States Court of Appeals
## For the First Circuit

No. 14-2137

UNITED STATES OF AMERICA,

Appellee,

v.

ERNEST FIELDS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, with whom the Federal Public Defender Office was on brief, for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

May 13, 2016

**BARRON**, **Circuit Judge**. Ernest Fields ("Fields") pleaded guilty to being a felon in possession of a firearm and ammunition. On appeal he contends that his conviction must be overturned because the police obtained the firearm and ammunition in consequence of a violation of the Fourth Amendment. Fields also appeals his sentence. He contends that it must be vacated because the District Court mistakenly concluded that a United States Sentencing Guidelines (the "Guidelines") enhancement for career offenders applied to him. We affirm the conviction but vacate and remand the sentence.

## I.

On April 10, 2013, Fields was indicted under 18 U.S.C. § 922(g)(1) on one count of being a felon in possession of a firearm and ammunition. The indictment arose out of an encounter between Fields and the Boston police in the early morning hours of September 12, 2012. The encounter occurred near Madison Park High School in the Roxbury neighborhood of Boston. It lasted several minutes.

At first, the encounter involved only Fields and one Boston police officer. But that officer eventually called for backup, and four additional officers arrived on the scene. At some point after those officers arrived, the police conducted a pat-frisk of Fields. The police acquired the firearm and ammunition during that frisk.

Following the indictment, Fields sought to suppress the firearm and ammunition on the ground that the police had acquired that evidence only because they had seized Fields without a legally sufficient basis for doing so.  The District Court, after holding a hearing, denied Fields's motion.  United States v. Fields, No. 13-10097-DJC, 2014 WL 2616636 (D. Mass. June 11, 2014).

The District Court ruled that Fields was seized neither when the officer that he initially encountered spoke with him nor when the four officers later arrived as backup.  The District Court did hold that the police seized Fields later on in the encounter, when the police physically subdued Fields in order to conduct a pat-frisk of him.  At that time, the District Court concluded, the police had a lawful basis to seize and search Fields because the police had probable cause to arrest him for assault and battery on a police officer.[1]

On June 12, 2014, Fields pleaded guilty to the felon-in-possession count.  In doing so, he reserved his right to challenge on appeal the District Court's denial of his motion to suppress.

---

[1] The District Court also ruled in the alternative that suppression was not warranted because even if the seizure did occur at the time the four backup officers arrived on the scene, the police would have inevitably discovered the firearm and the ammunition.

On October 22, 2014, the District Court sentenced Fields to a term of imprisonment of 60 months, to be followed by three years of supervised release. In selecting the sentence, the District Court referenced the Guidelines sentencing range that had been set forth in Fields's pre-sentence report ("PSR").

The PSR calculated that range as follows. The PSR assigned Fields a base offense level ("BOL") under the Guidelines of 24. In calculating Fields's BOL, the PSR applied U.S.S.G. § 2K2.1(a)(2). That guideline provides for an enhancement to the defendant's BOL if the defendant satisfies certain career offender requirements. Under that enhancement, "if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of . . . a crime of violence," the defendant shall be assigned a BOL of 24.[2] U.S.S.G. § 2K2.1(a)(2) (emphases added).

The PSR identified the following two prior felony convictions of Fields as convictions of a "crime of violence": his conviction for resisting arrest for which he was sentenced in September 2010, and at least one of a set of convictions that arose out of a single incident and for which Fields had received a single

---

[2] The total offense level was calculated to be 21 after a three-level downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1(b).

sentence in July 2010.[3]  Those July 2010 convictions included convictions under Massachusetts law for assault with a dangerous weapon ("ADW"), assault and battery with a dangerous weapon ("ABDW"), assault and battery on a police officer ("ABPO"), and resisting arrest.[4]

The District Court concluded that the Guidelines range reflected in the PSR was properly calculated at 70-87 months, which was consistent with Fields's having a BOL of 24 and a criminal history category of V.  But the District Court also concluded that a downward departure in Fields's criminal history category was warranted because that category, although properly calculated, substantially overrepresented the seriousness of Fields's criminal history.  See U.S.S.G. § 4A1.3(b).  That departure translated to a Guidelines range of 60-71 months, which was consistent with applying a BOL of 24 and a criminal history category of IV to Fields.  The District Court then sentenced Fields to a term of

---

[3] The record does not disclose the dates of conviction for the convictions referenced.  References to the "September 2010 conviction" and the "July 2010 convictions" thus refer to the dates of sentencing.

[4] The PSR also assigned Fields a criminal history score of 12 under the Guidelines, which translated to a criminal history category of V.  In calculating Fields's criminal history score, the PSR applied a sentencing enhancement that resulted in Fields's receiving three criminal history points because his July 2010 convictions for ABDW, ABPO, and resisting arrest were classified as convictions of a crime of violence under the career offender guideline.  See U.S.S.G. § 4A1.1(e).

imprisonment -- 60 months -- that was at the low end of that lower range.

On appeal, Fields challenges both his conviction and his sentence. He challenges his conviction on the ground that the District Court erred in denying his motion to suppress the firearm and ammunition. Fields challenges his sentence on the ground that the District Court erred in classifying his prior convictions as convictions of a crime of violence for purposes of calculating his BOL under the Guidelines.

We first consider Fields's challenge to his conviction. We then turn to his challenge to his sentence.

## II.

Fields argues that his conviction must be vacated because the District Court erred in denying his motion to suppress the firearm and ammunition. "When reviewing a challenge to the district court's denial of a motion to suppress, we view the facts in the light most favorable to the district court's ruling on the motion, and we review the district court's findings of fact and credibility determinations for clear error." United States v. Fermin, 771 F.3d 71, 76 (1st Cir. 2014) (quoting United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011)). We review conclusions of law, including the ultimate conclusion whether a seizure occurred, de novo. Camacho, 661 F.3d at 724. Fields bears the burden of establishing that he was seized. Id.

## A.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  "The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops."  Camacho, 661 F.3d at 724.  An officer may ordinarily execute a Terry stop without running afoul of the Fourth Amendment if the officer "reasonably suspects that the person apprehended is committing or has committed a crime."  Id. at 726 (quoting Arizona v. Johnson, 555 U.S. 323, 323 (2009)).

The police need not have taken physical custody of a person in order to be deemed to have effected a Terry stop for which at least reasonable suspicion is required.  Such a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a "show of authority."  See United States v. Mendenhall, 446 U.S. 544, 553-54 (1980).  Such a "show of authority" occurs, however, only when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id. at 554.  And, further, the show of authority effects a seizure only when the defendant actually yields or submits to the show of authority.  See California v. Hodari D., 499 U.S. 621, 628-29 (1991).

We appreciate "that few people . . . would ever feel free to walk away from any police question."  United States v.

- 7 -

Cardoza, 129 F.3d 6, 16 (1st Cir. 1997).  But that reality obviously does not mean that every police-citizen encounter results in a show of authority for Fourth Amendment purposes.  See id.  The "free to leave" test thus focuses on whether the conduct of law enforcement "objectively communicate[s] that [law enforcement] is exercising [its] official authority to restrain the individual's liberty of movement."  Id. (emphasis added).

The Supreme Court has identified several characteristics of an encounter with law enforcement that might indicate that there was a show of authority.  These characteristics include: "[1] the threatening presence of several officers, [2] the display of a weapon by an officer, [3] some physical touching of the person of the citizen, or [4] the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Mendenhall, 446 U.S. at 554.

**B.**

Fields's challenge to the District Court's ruling on his suppression motion rests on his contention that he was not "free to leave" -- and thus that a seizure occurred due to a "show of authority" -- when the four officers arrived at the scene in response to a call for backup from the officer Fields initially encountered.  According to Fields, the five officers at that point made the requisite show of authority even though they lacked a lawful basis to seize him.

The government responds in part by arguing that it does not matter whether the arrival of the officers did result in a show of authority, because the police had reasonable suspicion to justify Fields's seizure even at that point in the encounter. To support this conclusion, the government argues that the first officer who encountered Fields reasonably suspected that Fields had previously trespassed on public property and thus that this officer had reasonable suspicion to detain Fields even at that time.

There is a question whether the government is right that the police would have been justified under the Fourth Amendment in seizing Fields on the basis of reasonable suspicion that he had committed that trespassing offense, given that it was a completed non-felony offense. Compare Gaddis v. Redford Township, 364 F.3d 763, 771 n.6 (6th Cir. 2004) ("Police . . . may make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor [or lesser infraction]."), with United States v. Moran, 503 F.3d 1135, 1141 (10th Cir. 2007) (noting the circuit split on whether reasonable suspicion of a completed non-felony offense can justify a Terry stop under the Fourth Amendment and declining to adopt the Sixth Circuit's per se rule). But we need not decide that question. And that is because we affirm the District Court's conclusion that no show of

authority -- and thus no seizure -- had occurred as of the time that the four backup officers arrived on the scene.

To explain why we reach this conclusion, we first describe the encounter between Fields and the police in some detail, as the determination of the point at which a show of authority occurs is necessarily dependent on the particular facts in each case. We then explain why there was no error in the District Court's conclusion that the facts do not suffice to demonstrate that Fields has met his burden of showing that there was a show of authority -- and thus a seizure -- at the time that the backup officers arrived on the scene.

## c.

In describing what happened that night, "we relate the facts 'as the trial court found them, consistent with record support.'" United States v. Ford, 548 F.3d 1, 2 (1st Cir. 2008) (quoting United States v. Ruidiaz, 529 F.3d 25, 27 (1st Cir. 2008)). The encounter began in the early hours of September 12, 2012. Officer Steven Dodd and other police officers were investigating a complaint that a group of people had gathered near Madison Park High School and had intended to engage in drug activity.

Following the receipt of that complaint, Officer Dodd and his team briefly caught sight of a group of eight to ten individuals in that area. But the officers lost track of the

group.  Officer Dodd therefore radioed to other officers in the area to seek their help in locating a group that he reported was heading from the front of the high school toward Roxbury Heritage State Park and Roxbury Street.

Officer Joseph Fisher, who was working a routine patrol at the time, responded to the call.  He parked his police cruiser on the east end of Roxbury Street so that it was facing the direction of the Roxbury Heritage State Park.  Soon thereafter, Officer Fisher observed a group of six to eight individuals traveling from the state park area to Roxbury Street.

At that point, Fields appeared to break off from the group that had just emerged onto Roxbury Street.  Fields then headed in the direction of Officer Fisher while the rest of the group headed in the opposite direction.  As Fields passed Officer Fisher's police cruiser, Officer Fisher got out of the car. Officer Fisher then proceeded to the rear of the vehicle (driver's side), and called out to Fields in a conversational tone, "Hey, what's going on tonight?"

Upon hearing Officer Fisher's question, Fields turned around, walked back a few steps toward the rear of the cruiser (passenger's side), and proceeded to speak with Officer Fisher. Officer Fisher at that point made a few general inquiries of Fields, including asking Fields where he was coming from and where he was going.

The conversation quickly became "one-sided," however. Fields asserted that he was not comfortable with the police; that police made him nervous; that police had killed someone in the South End; and that Officer Fisher would need a reason to search him.

Officer Fisher observed that Fields was becoming increasingly agitated. "At this point, [Officer Fisher] had made no commands to Fields, had not requested any identification, had no physical contact with [Fields], had not blocked [Fields's] path down the street and . . . had kept his firearm holstered throughout the exchange." Fields, 2014 WL 2616636, at *2.

According to the District Court, Officer Fisher became concerned about the "nature and tone" of Fields's comments and Fields's general behavior, and so the officer called for backup by using the radio in his tactical vest. Id. Specifically, Officer Fisher radioed that he was "off with one on Roxbury Street by myself."

Within about a minute, four other police officers (including Officer Dodd) arrived on the scene. They emerged from an area near the front of the cruiser.

According to Officer Fisher's account, the officers positioned themselves at the sides of his police cruiser, such that neither the officers nor the police cruiser blocked Fields from proceeding down Roxbury Street toward Malcolm X Boulevard,

- 12 -

which was the direction in which Fields was originally traveling. Officer Dodd's testimony, although different in some respects from Officer Fisher's testimony, was also that none of the officers "stood directly in front of Fields." Id. Thus, according to Officer Dodd's account, too, Fields could have continued down Roxbury Street toward Malcolm X Boulevard.

None of the backup officers spoke to Fields. Fields reiterated his nervousness and displayed more agitation during this portion of the encounter. It was not until Fields lifted his shirt and inadvertently revealed that he had a knife on his person that the officers moved toward Fields and that Officer Dodd indicated that he was going to conduct a pat-frisk of Fields. Fields resisted the pat-frisk by pushing Officer Dodd's hands away twice. Officer Fisher and Officer Andrew Hunter then moved in to assist Officer Dodd by pinning Fields's arms to his side, thereby enabling Officer Dodd to conduct a pat-frisk of Fields.[5]

**D.**

Fields contends that the presence of multiple officers, the formation of the officers, and the calling of backup by Officer Fisher in Fields's presence, in combination, constituted a "show of authority" and thus converted the encounter at that point into

---

[5] Officers Dodd and Hunter were wearing plainclothes with Boston Police badges while Officers Fisher, Jose Dias, and Michael MacDougall were in uniform at the time in question.

a Terry stop for which reasonable suspicion was required. But the District Court concluded otherwise on the basis of all the circumstances of the encounter described by the testimony at the suppression hearing. We do not see a basis for overturning the District Court's ruling.

It is well established that the absence of police commands or any sort of verbal demonstration of authority weighs against the conclusion that there has been a show of authority sufficient to effect a seizure. Compare United States v. Drayton, 536 U.S. 194, 200-01 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition on unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."), and Cardoza, 129 F.3d at 16 (noting as significant in finding no seizure the fact that the officer did not ask defendant to stop or to approach police car), with United States v. Espinoza, 490 F.3d 41, 49 (1st Cir. 2007) (finding seizure where single officer approached defendant's vehicle and asked defendant, in a commanding tone, to shut off engine). It is thus significant that the District Court found that there were no such demonstrations here.

The testimony at the hearing supports the finding by the District Court that the verbal exchange between Fields and Officer Fisher was, on the whole, dominated and perpetuated by Fields

- 14 -

himself. Moreover, the District Court supportably found that Officer Fisher, to the extent he did speak to Fields, merely asked general questions in a conversational way.

Similarly, the record supports the District Court's finding that, prior to the sighting of the knife, none of the four backup officers spoke to Fields at all. Thus, although the backup officers were on the lookout for illegal group activity, the record accords with the District Court's finding that -- at the relevant time -- none of those officers made any comments to Fields that indicated that they were treating Fields as a potential suspect or, more directly, that Fields should not leave.

The record also backs up the District Court's findings that none of the officers physically touched Fields, brandished their weapons, or, after arriving on the scene, moved toward Fields at any point prior to the sighting of the knife. These factors, too, weigh against the conclusion that a seizure occurred at the time that Fields contends one occurred. See Mendenhall, 446 U.S. at 554.

To be sure, the presence of five police officers and the formation of these officers are certainly "important" features of the encounter. See United States v. Berryman, 717 F.2d 651, 655 (1st Cir. 1983). And we have said in dicta that "[i]t is not clear that a reasonable person, surrounded by five police officers, would believe that he was free to leave." Fermin, 771 F.3d at 77. But

whether a person is "surrounded" is itself a judgment to be made from the facts of each case. After all, "the presence of multiple officers does not automatically mean that a stop has occurred." United States v. Goddard, 491 F.3d 457, 461 (D.C. Cir. 2007) (per curiam); see also Ford, 548 F.3d at 5.

In this case, the District Court supportably found that Fields was not meaningfully restricted in his field of movement in consequence of the arrival of the backup officers.[6] In making that finding, the District Court relied in part on our decision in United States v. Smith, 423 F.3d 25 (1st Cir. 2005). There, we held that the defendant was not "surrounded" by officers, because the officers -- in approaching the defendant while he was sitting on a wall with a telephone pole in front of him -- stood "where they had to" and because the defendant "could have moved in a variety of directions." Smith, 423 F.3d at 30.

Here, Fields, who was standing in front of a parked police cruiser at the time the backup officers arrived, appears to have had fewer points of departure from the scene than the defendant had in Smith. But the officers' testimony about the

---

[6] The District Court concluded that, whether Officer Dodd's or Officer Fisher's account of the positioning of the officers controls, "it remains the case that the officers, to assist Officer Fisher, had to stand somewhere in [Fields's] vicinity and could only do so around or behind the car and Fields still had point of egress either up or down, respectively, the street." Fields, 2014 WL 2616636, at *3.

- 16 -

positioning of the various parties, as well as the diagrams that the officers supplied depicting where the parties stood, accords with the District Court's determination that the positioning of the officers did not restrict Fields from walking in the direction in which he was originally traveling. For that reason, the formation of the police officers in this case does not compel a finding that Fields was "surrounded" or that law enforcement objectively communicated to him that he was not free to leave the scene. See Michigan v. Chesternut, 486 U.S. 567, 575 (1988) (finding no seizure in part because officers did not "block [defendant's] course [of travel] or otherwise control the direction or speed of his movement"); Camacho, 661 F.3d at 725 (finding seizure in part because officers "intentionally blocked" the path on which defendant was traveling with their Crown Victoria); Ford, 423 F.3d at 25 (finding no seizure in part because defendant, though restricted in his field of movement by the presence of two police officers and a telephone police, "could have moved in a variety of directions").

Of course, Fields did not actually leave the scene despite the available path afforded him and the absence of any verbal signals from the police that he was obliged to stay. But that is not determinative of whether the police objectively communicated to Fields that he was required to stay. See Hodari D., 499 U.S. at 628 ("[T]he test for existence of a 'show of

authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."). In fact, Fields similarly did not leave when he was initially in the presence only of Officer Fisher, yet Fields concedes that there was no show of authority at that point.

There remains Fields's contention that a show of authority occurred at the time he asserts because Officer Fisher called for backup and that call, coupled with the actual arrival of the four backup officers, objectively communicated to Fields that law enforcement was targeting him as a suspect and thus that he was not free to leave. But the principal case upon which Fields relies for this contention, United States v. Beauchamp, 659 F.3d 560, 566-67 (6th Cir. 2011), involved very different facts.

The court in that case concluded that a seizure occurred only after the defendant "walk[ed] away from the police two times" and was told to stop, turn around, and walk toward the police. Id. at 566. The Sixth Circuit, quite reasonably, determined that the police officers' persistence in pursuing the defendant notwithstanding the defendant's attempts to walk away, in combination with the request by one of the officers that the defendant stop, objectively communicated to the defendant that he was under investigation and thus that he was not free to leave. See id. at 567.

- 18 -

Unlike in Beauchamp, however, the police did not follow Fields after he had walked away. The police also did not at any point tell Fields not to leave. The testimony at the suppression hearing reveals only that Officer Fisher asked Fields some general questions and that Officer Fisher, after becoming concerned with Fields's statements and seeming agitation, radioed that he was "off with one on Roxbury Street by myself." The backup officers never spoke to Fields after they arrived. Thus, "the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement" for the purpose of investigating criminal wrongdoing. Chesternut, 486 U.S. at 575.

Moreover, in a given encounter, there may be legitimate reasons for an officer to summon and maintain backup, such as ensuring the officer's safety, that do not relate to the investigation (let alone detention) of a suspect. The arrival of backup officers in response to a call for assistance thus may signal, depending on the facts, only that backup will remain on the scene in the event that the person who has encountered a lone police officer chooses to stay, rather than that such a person is not free to leave. See State v. Thomas, 246 P.3d 678, 686 (Kan. 2011) (noting that "a mere call for back-up does not automatically transform all citizen-law enforcement encounters into investigatory detentions"); State v. Green, 826 A.2d 486, 499 (Md.

- 19 -

2003) ("That [law enforcement] called for back-up as a safety measure did not suddenly transform the consensual encounter into a seizure.").

Here, during the radio call, even if heard by Fields (a point on which the District Court made no finding and on which the record is unclear), Officer Fisher did not state that he was asking for other officers to assist him in an effort to investigate whether Fields had been engaged in criminal activity. Instead, Officer Fisher appeared to be communicating only a concern for his safety -- as evidenced by the words "by myself" -- due to the agitation that Fields was exhibiting in his presence. So while a reasonable person in Fields's shoes could perceive that the four officers who arrived did so on his account and not due to pure happenstance, it does not follow that their arrival therefore objectively communicated to Fields that the police were targeting him in the Beauchamp sense.

Indeed, a conclusion that the summoning and subsequent arrival of backup automatically -- and without regard to other facts that bear on the nature of the encounter as a whole -- constitutes a show of authority could have a distorting effect on an officer's decision about whether to take a precaution for his own safety. Such an automatic rule would import into an officer's calculus about whether to call for backup a determination about whether there is a lawful basis to detain the person the

- 20 -

officer has encountered.  But the decision to detain someone so that he or she may not leave may be distinct from the decision to call for backup in order to ensure an officer's safety in the event that the person in question chooses to stay.  We thus decline to adopt a per se approach in this context.  Cf. Michigan v. Long, 463 U.S. 1032, 1052 (1983) (noting, in concluding that police officers may, consistent with the Fourth Amendment, sometimes search the passenger compartments of a car for weapons during a lawful Terry stop, "we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a Terry encounter").

**E.**

The totality of the circumstances test for assessing whether a show of authority has occurred "does not produce a crystalline landscape in our Fourth Amendment jurisprudence." Ford, 548 F.3d at 7.  "Th[at] test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Chesternut, 486 U.S. at 573.

But the burden is on Fields to establish the show of authority that is the necessary predicate for his claimed Fourth Amendment violation.  And under the totality of the circumstances test that we must apply, we do not on these facts see a basis for

overturning the District Court's conclusion that Fields failed to demonstrate that there was a show of authority at the time the four backup officers arrived on the scene -- a conclusion, we add, that the District Court reached only after a thorough consideration of the testimony and evidence presented at the suppression hearing. We thus affirm the District Court's decision to deny Fields's motion to suppress on the basis that there was no show of authority and consequently no unlawful seizure at the time that Fields contends one occurred.

## III.

We now turn to Fields's challenge to his sentence. Before we address the merits of his challenge, though, we need to step back so that we can explain precisely what is in dispute -- and what is not.

Fields contends that the District Court erroneously subjected him to a particular career offender enhancement under the Guidelines, with the result that he was assigned too high of a BOL and thus too high of a Guidelines sentencing range. Specifically, Fields contends that the District Court erred in applying the enhancement set forth in U.S.S.G. § 2K2.1(a)(2), which provides for a BOL of 24 if the defendant has two prior convictions of a crime of violence under the career offender guideline. Fields argues that, in fact, none of his prior convictions qualified as convictions of a crime of violence under the career offender

guideline. Fields thus contends that his BOL should have been 14, as that is the BOL that would have applied had Fields received no career offender enhancement. See U.S.S.G. § 2K2.1(a)(6)(A).

In response, the government agrees that the District Court's application of the sentencing enhancement set forth in U.S.S.G. § 2K2.1(a)(2) was erroneous. The government takes that position because the District Court classified Fields's September 2010 conviction for resisting arrest as a conviction of a crime of violence under the career offender guideline, and the government concedes on appeal that conviction cannot be so classified on this record. The government also agrees with Fields that, in consequence of this error, the case should be remanded for resentencing.

The government does not agree with Fields, however, that the BOL that should be applied to him on remand should be 14. Rather, the government contends that the BOL that should be applied to Fields on remand should be 20, which is the BOL that would apply to a defendant subject to the enhancement set forth in U.S.S.G. § 2K2.1(a)(4)(A). The government contends that the District Court should apply that enhancement instead of the one set forth in U.S.S.G. § 2K2.1(a)(2), which was the Guidelines provision that the District Court applied below. The enhancement that the government contends should apply on remand requires that the defendant have only one prior conviction of a crime of violence,

- 23 -

rather than the two such convictions required under U.S.S.G. § 2K2.1(a)(2).

In practical terms, the dispute over the proper BOL to apply to Fields on remand matters in the following way. Assuming that the District Court will again sentence Fields on the basis of a criminal history category of IV, Fields's Guidelines range would be 37-46 months on the government's view, which is the range consistent with a BOL of 20. On that same assumption, Fields's Guidelines range would be 21-27 months on Fields's view, which is the range consistent with a BOL of 14.

To support the application on remand of a BOL of 20, the government contends that Fields's July 2010 convictions for ADW and ABDW together "constitute <u>one</u> qualifying conviction [of] a 'crime of violence'" under the career offender guideline, Gov. Br. 55 (emphasis added), and that the enhancement set forth in U.S.S.G. § 2K2.1(a)(4)(A) therefore should apply.[7] Given the government's argument, we need not decide whether both of Fields's July 2010 convictions for ADW and ABDW qualify as convictions of a crime of violence. We need only decide whether one of them does, as the

---

[7] The government does not ask us to conclude that Fields's July 2010 convictions for ADW and ABDW each constitute a conviction of a crime of violence and thus trigger the application of U.S.S.G. § 2K2.1(a)(2). Nor does the government argue that Fields's July 2010 convictions for resisting arrest and ABPO, either independently or together, constitute convictions of a crime of violence.

- 24 -

only career offender enhancement that the government contends should apply would then be triggered.

The District Court, in assessing Fields's BOL, did not pass on which of Fields's July 2010 convictions qualified as a conviction of a crime of violence. The District Court thus did not specifically pass on whether either of Fields's July 2010 convictions for ADW and ABDW qualified as a conviction of a crime of violence. But the question is one of law, and the parties do not ask us to remand so that the District Court can pass on the question in the first instance. We thus proceed to analyze the issue.

Fields did not object below to the classification of any of his convictions as convictions of a crime of violence, see United States v. Ríos-Hernández, 645 F.3d 456, 462 (1st Cir. 2011) (noting that in such cases the plain-error standard of review ordinarily applies), but the government does not appear to ask us to apply the plain-error standard of review in evaluating Fields's challenge. In any event, the standard of review is of little consequence here because, as we next explain, it is clear that at least one of Fields's July 2010 convictions for ADW and ABDW qualifies as a conviction of a crime of violence.[8]

---

[8] In his opening brief, Fields argued that the residual clause of the career offender guideline was unconstitutional and thus that his prior convictions did not qualify as convictions of a crime of violence. As the government notes, Fields did not address

In undertaking our inquiry, we start with -- and, it turns out, end with -- Fields's July 2010 conviction for ADW, because we conclude that that conviction does qualify as a conviction of a crime of violence. To explain why this is the case, we must first provide some background.

The career offender guideline defines a "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise

---

the prospect that his prior convictions might nevertheless qualify as convictions of a crime of violence under the force clause of the career offender guideline. It was only in his reply brief that Fields addressed that prospect. Ordinarily, we treat arguments raised for the first time in an appellant's reply brief as waived. See United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008). It is unclear whether the government urges us to follow that practice here. In any event, we may make an exception where "justice so requires" and where the opposing party would not be unfairly prejudiced by our considering the issue. See United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011). And here, we believe such an exception is proper. Johnson v. United States, 135 S. Ct. 2551 (2015) (holding unconstitutional the residual clause contained in the definition of "violent felony" in the Armed Career Criminal Act), was decided after Fields's opening brief was filed. That decision made the force clause loom larger than otherwise would have been the case. Given that the government does not clearly press for waiver and that the arguments concerning whether Fields's prior convictions may qualify even under the force clause have now been fully joined by both parties, we see no prejudice to the government in considering such arguments.

involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). The first subparagraph of the career offender guideline is often referred to as the "force clause." The trailing portion of the second subparagraph of that guideline is often referred to as the "Guidelines' residual clause."

The parties agree that, in light of Johnson v. United States, 135 S. Ct. 2551 (2015) ("Johnson II"), the residual clause of the career offender guideline is unconstitutional and thus may not be relied upon to classify a conviction as a conviction of a crime of violence under the career offender guideline. We assume without deciding that the parties are correct in their interpretation of the status of the residual clause. See United States v. Soto-Rivera, 811 F.3d 53, 59 (1st Cir. 2016). We therefore consider only whether the July 2010 ADW conviction qualifies as a conviction of a crime of violence under the force clause of the career offender guideline.

To assess whether a conviction qualifies as a conviction of a crime of violence under that clause, we must apply what is known as the "categorical" approach. Under that approach, "we compare the statutory elements of the crime for which the defendant was previously convicted" -- "without regard to the specific facts" or conduct underlying that conviction -- "with Congress's definition of the type of crime that may serve as a predicate

offense" (that is, a crime of violence).  United States v. Fish, 758 F.3d 1, 5 (1st Cir. 2014).  The object is to determine "whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a crime of violence."  Id.[9]

The Commonwealth's ADW statute is violated by "[w]hoever, by means of a dangerous weapon, commits an assault upon another."  Mass. Gen. Laws ch. 265, § 15B(b).  Massachusetts law recognizes two theories of assault: attempted battery and threatened battery.  Commonwealth v. Porro, 939 N.E.2d 1157, 1163 (Mass. 2010).  Battery has been defined as "harmful [or] offensive touching."  See Commonwealth v. Burke, 457 N.E.2d 622, 624 (Mass. 1983).  The crime of simple assault has thus been held to encompass both attempted and threatened offensive touching.  See United States v. Martinez, 762 F.3d 127, 138 (1st Cir. 2014).  ADW "adds one additional element, namely, that the assault was perpetrated by means of a dangerous weapon."  United States v. Whindleton, 797 F.3d 105, 112 (1st Cir. 2015) (quoting Commonwealth v. Melton, 763 N.E.2d 1092, 1096 (Mass. 2002)); see Commonwealth v. Appleby, 402 N.E.2d 1051, 1056-57 (Mass. 1980) (explaining the dangerous weapon element).  Finally, under either the attempted battery form or the

---

[9] In certain circumstances involving divisible state statutes, the Court instructs us to apply what is known as the "modified categorical" approach.  See Descamps v. United States, 133 S. Ct. 2276, 2281-82 (2013).  The government does not ask us to apply that approach here.

threatened battery form of ADW, the mens rea is one of specific intent, as the defendant must either intend to commit a battery or intend to put the victim in fear of an imminent battery.  See Porro, 939 N.E.2d at 1163.

Fields contends that a conviction under the Massachusetts ADW statute does not qualify as a conviction of a crime of violence under the force clause because the Massachusetts ADW statute criminalizes attempted or threatened offensive touching.[10]  Fields bases that contention solely on Johnson v. United States, 559 U.S. 133 (2015) ("Johnson I").[11]  In Johnson I, the Court interpreted the force clause contained in the definition of "violent felony" in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(i).  In doing so, the Court held that "the phrase 'physical force' means violent force -- that is, force

---

[10] Fields does not contend that a conviction under the Massachusetts ADW statute fails to qualify as a conviction of a crime of violence because one may be convicted of that offense on the basis of only a mens rea of recklessness.  And for good reason.  As we recently concluded in the context of holding that "a conviction under [the Massachusetts ADW statute] includes a mens rea requirement sufficient to qualify the conviction as a predicate under the [Armed Career Criminal Act's] force clause," "under Massachusetts decisional law an ADW conviction requires that the use or threat of physical force be intentional."  United States v. Hudson, No. 14-2124, 2016 WL 2621093, at *4-5 (1st Cir. May 9, 2016).  To the extent Fields contends that we suggested otherwise in United States v. Am, 564 F.3d 25 (1st Cir. 2009), Hudson explains that "[a]lthough ABDW may be committed recklessly, we made clear in Am that ADW cannot be."  Id. at *4 n.8.

[11] The references to Johnson I and Johnson II are for convenience only, as these cases bear no meaningful relationship to one another.

capable of causing physical pain or injury to another person."
Id. at 140 (emphasis in original). The Court thus concluded that, under the categorical approach, a conviction under a Florida simple battery statute did not qualify as a conviction of a "violent felony" within the meaning of the ACCA's force clause because that statute criminalized offensive contact such as an unconsented-to tap on the shoulder -- that is, conduct not involving "violent force." Id. at 138.

Fields's argument, however, is foreclosed by our recent decision in United States v. Whindleton, 797 F.3d 105 (1st Cir. 2015). There, we held that a conviction under the Massachusetts ADW statute categorically qualified as a "violent felony" within the meaning of the ACCA's force clause, because "the element of a dangerous weapon imports the 'violent force' required by [Johnson I] into the otherwise overbroad simple assault statute." Id. at 114. We reasoned that "the harm threatened by assault is far more violent than offensive touching when committed with a weapon that is designed to produce or used in a way that is capable of producing serious bodily harm or death." Id. In other words, we concluded that a conviction under the Massachusetts ADW statute categorically qualified as a violent felony under the ACCA's force clause because the minimum conduct criminalized by the statute qualifies as such by virtue of the dangerous weapon element. See also United States v. Hudson, No. 14-2124, 2016 WL 2621093, at *4

(1st Cir. May 9, 2016) ("[W]e reaffirm that a Massachusetts ADW conviction meets the physical force requirement under the force clause of the ACCA.").

True, this case involves the career offender guideline and the definition of "crime of violence" rather than the ACCA and the definition of "violent felony."  But we have expressly stated that "the terms 'crime of violence' under the career offender guideline and 'violent felony' under the ACCA are nearly identical in meaning, s[uch] that decisions construing one term inform the construction of the other."  United States v. Willings, 588 F.3d 56, 58 n.2 (1st Cir. 2009).  In fact, the force clause language of these provisions is identical.

We thus conclude that, in light of Whindleton, Fields's July 2010 ADW conviction qualifies as a conviction of a crime of violence under the force clause of the career offender guideline.[12]

---

[12] Fields points out that in United States v. Fish, this Court stated that a conviction under the Massachusetts ABDW statute would not qualify as a conviction of a crime of violence under the force clause of 18 U.S.C. § 16 because offensive touching does not (after Johnson I) "have 'as an element' the use of physical force."  758 F.3d 1, 9 (1st Cir. 2014).  Fields contends that Fish's logic extends to describe the nature of a conviction under the Massachusetts ADW statute, as that statute criminalizes attempted and threatened offensive touching.  But the discussion of the force clause in Fish was dicta, as the Court based its holding on the residual clause in § 16 rather than the force clause.  See id. (noting that the government in Fish declined to argue that the defendant's prior conviction under the Massachusetts ABDW statute qualified as a conviction of a crime of violence under the force clause of § 16).  Thus, Fish's holding provides no support for Fields's argument.

As a result, we vacate and remand Fields's sentence for resentencing, in accordance with the government's request regarding the application of the sentencing enhancement set forth in U.S.S.G. § 2K2.1(a)(4)(A).[13]

**IV.**

For the reasons stated, we **AFFIRM** the District Court's denial of Fields's motion to suppress.  But we **VACATE** and **REMAND** for resentencing proceedings consistent with this opinion.

---

[13] Fields does not appear to challenge, either in his opening brief or his reply brief, the District Court's classification of his prior convictions as convictions of a crime of violence for purpose of calculating his criminal history (as opposed to his BOL).