# United States Court of Appeals
## For the First Circuit

No. 18-1271

UNITED STATES OF AMERICA,

Appellee,

v.

ERIC TANGUAY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Stanley W. Norkunas on brief for appellant.
Seth R. Aframe, Assistant United States Attorney, and Scott W. Murray, United States Attorney, on brief for appellee.

March 8, 2019

**KAYATTA**, <u>Circuit Judge</u>.  Eric Tanguay was seated in his car with a friend in a parking lot when a local police officer approached and asked him several questions.  His answers led to a search, followed by the seizure of evidence of potential drug trafficking.  On this appeal following his conviction under 21 U.S.C. § 841(a), Tanguay contends that the district court erred in failing to suppress that evidence.  For the following reasons, we find the search and seizure to have been lawful, so we affirm.

## I.

We recite the facts "as the trial court found them, consistent with record support."  <u>United States</u> v. <u>Ruidíaz</u>, 529 F.3d 25, 27 (1st Cir. 2008) (quoting <u>United States</u> v. <u>Lee</u>, 317 F.3d 26, 30 (1st Cir. 2003)).

Shortly after midnight on March 31, 2016, police officer Adam Rayho drove by a local strip mall in Nashua, New Hampshire while on patrol.  In the parking lot he saw an SUV parked apart from any other vehicle and approximately 100 to 150 feet from a Taco Bell restaurant, which had not yet closed.  The only other business in the vicinity that remained open was a 24-hour gym.

Approximately twenty minutes later, after responding to an unrelated call, Rayho drove by the lot a second time.  The lone SUV was still parked in the same spot.  He decided to investigate.  He entered the lot and pulled his marked cruiser seven to ten feet behind the parked SUV without obstructing its

path of egress. Rayho illuminated the SUV with his floodlights and activated the rear-facing -- but not the front-facing -- blue, flashing emergency lights atop his cruiser. The record does not indicate whether the rear-facing flashing lights were visible to the occupants of the parked SUV.

With his weapon holstered, Rayho approached the driver-side of the SUV with a flashlight in hand. He further illuminated the interior of the SUV with his flashlight and asked the driver, Eric Tanguay, and the passenger, Jacqueline, for their names, which they provided. Recognizing Tanguay's name as a reported user and dealer of illegal drugs, Rayho asked them what they were doing in the parking lot so late. They replied that they "were eating food from Taco Bell." Rayho could see that was indeed the case and joked with them that he also enjoyed Taco Bell.

Rayho asked the couple for their licenses. Both replied that they were not carrying identification. When Rayho then asked who owned the SUV, Tanguay stated that he did not own it. Rayho finally asked Tanguay "if it would be all right if [he] returned to [his] cruiser to conduct a [records] query on him," to which Tanguay said it would be. At some point during this initial encounter -- yet exactly when is unclear from the record -- a second police officer arrived and parked his cruiser behind Rayho's vehicle.

From that point on, things went downhill quickly for Tanguay. While sitting in his cruiser running the records check, Rayho noticed Jacqueline crouch down and reach for something under the front passenger seat. Rayho immediately returned to the SUV and again asked Tanguay for identification. This time, Tanguay said his license was in a backpack in the trunk of the vehicle, and he requested permission to obtain it. Rayho agreed that Tanguay could show him where in the trunk he could find the license but stated that, for safety purposes, he would be the one to retrieve it.

When Tanguay opened his door to go to the trunk of the SUV, Rayho saw what appeared to be the butt end of a gun stashed in the driver-side door. Tanguay and Rayho walked to the rear of the SUV and opened the trunk. Rayho then retrieved Tanguay's license from a wallet stowed in a small pocket of the backpack. Rayho noticed that the wallet contained a large sum of cash (later determined to be $2,800) and that the large, main compartment of the backpack was padlocked.

When asked about the gun in the driver-side door, Tanguay informed Rayho that it was merely a BB gun. Rayho ordered Jacqueline out of the SUV and confirmed that the weapon was, in fact, a BB gun. Rayho then asked for and received Tanguay's consent to search the vehicle. Under the passenger seat, he found a partially open sunglasses case, containing a loaded hypodermic

needle, a pill, and Narcan (an opioid-overdose-reversal drug). When confronted with this discovery, Tanguay informed Rayho that Jacqueline was a drug user and was likely carrying drugs. Rayho next asked about the padlock on the backpack. Tanguay became visibly nervous and stated that an unknown individual had placed the padlock there. Rayho then arrested Tanguay on suspicion of possession of a controlled substance.

At the police station, Rayho again asked Tanguay about the backpack. Tanguay admitted that it was his, but he doubled down on his claim that someone else had padlocked it. He also stated that he believed some other person had put illegal items in the bag. Tanguay then consented to a search of the backpack, and Rayho removed the lock with bolt cutters. Inside, Rayho found prescription pills, fentanyl, methamphetamine, a scale, baggies, rubber bands, a marker, and mail posted to Tanguay.

A grand jury indicted Tanguay for one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Subsequently, Tanguay filed a motion to suppress the government's evidence, arguing that Rayho lacked reasonable suspicion to initiate and continue the inquiries that led to the discovery of the evidence gathered against him. The district court denied the motion. Tanguay then entered a conditional guilty plea in which he preserved the right to appeal the district court's ruling on the motion to suppress. The

district court issued a judgment of guilty and sentenced him to thirty months in prison with three years of supervised release. Tanguay then timely filed this appeal.

## II.

## A.

Tanguay's motion to suppress the incriminating contraband raises two initial questions: When did Rayho's interaction with Tanguay become a non-consensual, investigatory stop? And when did Rayho acquire reasonable suspicion to conduct such a stop? If the latter occurred before the former, Tanguay has no valid Fourth Amendment challenge, see Arizona v. Johnson, 555 U.S. 323, 326 (2009) (explaining that a non-consensual, investigatory stop does not conflict with the Fourth Amendment if the officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense"), unless the investigatory inquiry became so intrusive as to require probable cause, see United States v. Young, 105 F.3d 1, 7-8 (1st Cir. 1997). But if Rayho effected a non-consensual, investigatory "Terry stop" before he had reasonable suspicion that a crime was afoot, then the officer violated Tanguay's Fourth Amendment rights. See United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016).

We have previously held that a driver's inability to provide identification and a legible vehicle registration provides a sufficient basis for an officer to suspect that the vehicle was

stolen.  See United States v. Tiru-Plaza, 766 F.3d 111, 117 (1st Cir. 2014); see also United States v. Cardona-Vicente, 817 F.3d 823, 828 (1st Cir. 2016) ("The driver of the car could not produce a driver's license, suggesting the Jeep may have been stolen."); United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) ("[T]he defendant's lack of a valid registration . . . or some other indicia of proof to lawfully operate and possess the vehicle in question . . . giv[es] rise to objectively reasonable suspicion that the vehicle may be stolen.").  Tanguay's initial failure to produce a driver's license coupled with his admission that he was not the owner of the SUV similarly provided Rayho with good reason to believe that something was awry and that the SUV may have been stolen.

Tanguay responds that Rayho did not claim to have believed that the SUV had been stolen.  But, "[i]n determining whether an officer had reasonable suspicion to justify a Terry stop . . ., the officer's subjective motives do not enter into the decisional calculus."  United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004) (citing Whren v. United States, 517 U.S. 806, 812 (1996)).

Furthermore, Tanguay cannot reasonably contend that Rayho's subsequent investigative inquiry exceeded the scope of a permissible Terry stop.  See generally Terry v. Ohio, 392 U.S. 1, 18-27 (1968); Young, 105 F.3d at 5-8.  A Terry stop does not

require probable cause so long as the police officer's actions are "reasonably related in scope to the circumstances which justified the interference," Young, 105 F.3d at 7, or are "reasonable in light of the circumstances that . . . develop[] during [the stop]," United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998). Officer Rayho's decision to run a records check (to which Tanguay consented) was entirely justified given Tanguay's lack of identification and proof of ownership. His return to the SUV to repeat his request for identification was a reasonable and proportionate response to Jacqueline's suspicious movements. And Rayho can hardly be criticized for ordering her removal from the vehicle and verifying that the weapon in the driver-side door was in fact a BB gun, for "officers must be allowed, during the course of [a Terry] stop, to take measures that are reasonably calculated to protect themselves or others from harm." United States v. Rasberry, 882 F.3d 241, 247 (1st Cir. 2018) (citing Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004)). Finally, Rayho's further questioning of Tanguay was a measured and reasonable response to finding the loaded needle, pill, and Narcan.

Accordingly, we find that when Tanguay initially failed to produce a license and indicated he was not the owner of the SUV, Rayho was entitled to conduct a non-consensual, investigative Terry stop, and he did not thereafter exceed the permitted scope of such an investigation before he acquired probable cause to

arrest Tanguay.  These findings leave Tanguay to argue that Rayho commenced the non-consensual, investigative stop before Tanguay's failure to produce a license gave rise to a reasonable suspicion that a crime was in progress.  It is to that argument that we next turn.

## B.

The government effectively concedes that Rayho had no reasonable suspicion of criminal activity prior to Tanguay's initial failure to produce identification.  So the pivotal question is whether Rayho's interaction with Tanguay prior to that point rose to the level of a "seizure" for which reasonable suspicion is required.

In Terry, the U.S. Supreme Court held that a Fourth Amendment seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away."  392 U.S. at 16.  However, "[t]he police need not have taken physical custody of a person in order to . . . effect[] a Terry stop for which at least reasonable suspicion is required.  Such a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a 'show of authority.'" Fields, 823 F.3d at 25 (quoting United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (opinion of Stewart, J.)).  Tanguay has the burden to establish that there was a show of authority sufficient to trigger a Fourth Amendment violation.  See id. at 31.

To determine whether a police officer has made such a "show of authority," the Supreme Court directs us to ask the following: "[I]n view of all of the circumstances surrounding the incident," would "a reasonable person . . . have believed that he was not free to leave[?]" Mendenhall, 446 U.S. at 554; see also INS v. Delgado, 466 U.S. 210, 215 (1984) (endorsing the test Justice Stewart enunciated in Mendenhall). At the same time, the Court has also held that officers -- even without any basis for suspecting that an individual has committed a crime -- "may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage -- as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 434-35 (1991) (citations omitted). In practice, there is some tension between the Court's "free to leave" test and its sanctioning of these suspicionless police-civilian encounters because, as we have recognized, "few people . . . would ever feel free to walk away from any police question[ing]." United States v. Cardoza, 129 F.3d 6, 16 (1st Cir. 1997); see also Edwin J. Butterfoss, Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins, 79 J. Crim. L. & Criminology 437, 440 (1988) ("[M]ost of the citizens in these 'nonseizure' encounters do not feel free to walk away."); David K. Kessler, Free to Leave? An Empirical Look at the Fourth

Amendment's Seizure Standard, 99 J. Crim. L. & Criminology 51, 73–79 (2009) (providing survey results demonstrating that few people would feel free to voluntarily terminate police questioning).

We tried to resolve this tension in Cardoza by adopting a test that asks whether the "police conduct, viewed from the totality of the circumstances, . . . objectively communicate[s] that the officer is exercising his or her official authority to restrain the individual's liberty of movement." Cardoza, 129 F.3d at 16. This is a "highly fact specific" inquiry. Id. at 15. Discerning such an objective communication of authority is easiest when the officer expressly asserts it through a command. See, e.g., United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (finding a show of authority when officers ordered the defendant to place his hands on the hood of a car); United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009) (finding a seizure when an officer commanded an individual to stop and remove his hand from his sweatshirt pocket); Estate of Bennett v. Wainwright, 548 F.3d 155, 172 (1st Cir. 2008) (finding officers' order to evacuate sufficiently coercive to constitute a show of authority); United States v. Espinoza, 490 F.3d 41, 50 (1st Cir. 2007) (finding a seizure when an officer ordered a driver to shut off his car engine); see also United States v. Smith, 423 F.3d 25, 30 (1st Cir. 2005) (finding no show of authority in part because police officers "did not summon [the defendant] to the [police] car, or

- 11 -

ask him to move from his seat on the wall, or demand that he do anything").

More difficult are those instances in which the officer communicates his or her authority by actions rather than words. Certainly the absence of any verbal command cuts against a finding of an objectively communicated exercise of authority. See, e.g., Fields, 823 F.3d at 28 ("It is well established that the absence of police commands or any sort of verbal demonstration of authority weighs against the conclusion that there has been a show of authority . . . ."). Nevertheless, non-verbal communications can undoubtedly be clear enough to constitute a show of authority. See, e.g., United States v. Belin, 868 F.3d 43, 48 (1st Cir. 2017) (finding a show of authority when an officer grabbed the defendant's arm and reached toward his waist with his other hand to frisk the defendant's waistband); see also Mendenhall, 446 U.S. at 554 (identifying several, non-exclusive indicia of a seizure, including the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

However, the officer's status as a police officer will not itself transform otherwise innocuous conduct into a non-verbal command, thus effectuating a seizure. See Smith, 423 F.3d at 28

("[S]ince most tend to feel some degree of compulsion when confronted by law enforcement officers asking questions, such discomfort cannot be the measure of a Fourth Amendment seizure. If it were, officers would effectively be barred from approaching citizens at all, absent full-blown probable cause."); Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 9.4(a) (5th ed. 2018) ("The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens.").  Gauging an officer's words and actions in this way (i.e., ignoring the implicit manifestation of authority conveyed by the officer's status as a police officer) likely means that submissions to police requests are often deemed uncoerced even when they are subjectively involuntary.  See Scott E. Sundby, The Rugged Individual's Guide to the Fourth Amendment:  How the Court's Idealized Citizen Shapes, Influences, and Excludes the Exercise of Constitutional Rights, 65 UCLA L. Rev. 690, 694 (2018) (explaining that the Supreme Court's Fourth Amendment jurisprudence assumes an idealized civilian in police-civilian interactions who "actively stand[s] up to law enforcement and assert[s] [their] rights"); see also I. Bennett Capers, Criminal Procedure and the Good Citizen, 118 Colum. L. Rev. 653, 666-67 (2018) (examining the Supreme Court's "citizenship talk" in its

Fourth Amendment cases and its assumption that civilians will welcome police inquiries, view them as consensual, and comply with police requests even when they need not). But our law, as we are bound to follow it, seems to accept this result as the price we pay for a greater ease in discovering criminal activity. See Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.").

Here, Rayho made no explicit, verbal command of Tanguay prior to acquiring reasonable suspicion that the SUV was stolen. Nor did his conduct, taken together, communicate a non-verbal command. Tanguay makes no claim that Rayho signaled to him to shut off the engine of the SUV, touched his weapon or Tanguay's person, spoke with intimidating language or tone of voice, or tarried long. See Mendenhall, 446 U.S. at 554; Espinoza, 490 F.3d at 50. And Tanguay offers no evidence that, before Tanguay failed to produce identification, Rayho called for backup in his presence, or that backup arrived. See Mendenhall, 446 U.S. at 554; Fields, 823 F.3d at 25. An ordinary citizen might have stopped and inquired into Tanguay's activity in the parking lot without engaging in behavior that would normally be deemed offensive (though it might come across as nosy). We see no reason to say that a police officer could not do the same without conveying a

- 14 -

non-verbal message of authority. Cf. LaFave, supra, § 9.4(a). And precedent indicates such to be the case, at least in the absence of some other display of authority. See United States v. Taylor, 511 F.3d 87, 91 (1st Cir. 2007) ("[A]pproaching a parked car and questioning the occupant does not necessarily rise to the level of a Terry stop . . . .").

On the other hand, Rayho did ask for a license, something that an ordinary citizen would not do without appearing quite presumptuous. But he asked -- he didn't order. And, in any event, that is the type of de minimis intrusion that we have long agreed to tolerate as a necessary part of policing. See Bostick, 501 U.S. at 434-35; see also Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."). Rayho's use of a flashlight and floodlight to illuminate the interior of the SUV also arguably comes close to communicating some type of command. But precedent again precludes us from treating this type of conduct as a command, perhaps because to rule otherwise would be to prevent officers from safely visiting parked vehicles at night. See Texas v. Brown, 460 U.S. 730, 739-40 (1983) ("[The officer's] action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."); see also United States v. Mabery, 686 F.3d 591, 597

- 15 -

(8th Cir. 2012) (finding no seizure when an officer shined a spotlight on a civilian's vehicle); United States v. Clements, 522 F.3d 790, 792, 794-95 (7th Cir. 2008) (finding no show of authority when officers activated a cruiser's spotlight and approached a parked car).

The activation of the blue flashing lights atop Rayho's cruiser is a different story. This is not the type of conduct in which an ordinary citizen would likely engage. Nor does the weight of precedent routinely classify such conduct as failing to send a message of command. Certainly drivers who view such lights in their rearview mirrors usually construe them as a command to pull over. See Brower v. County of Inyo, 489 U.S. 593, 598 (1989). Here, though, Rayho activated only his rear-facing lights, and Tanguay, who was already stopped, makes no claim to have been able to see them. See Camacho, 661 F.3d at 724 ("The [defendant] bears the burden of showing a violation of his Fourth Amendment rights."). So the blue lights need not enter into our consideration.

All told, considering Rayho's words and conduct as manifest to Tanguay, we find that Rayho did not use his authority to restrain Tanguay's liberty before Rayho acquired a reasonable suspicion that Tanguay was engaged in a crime. Accordingly, we cannot say that the district court erred in finding no Fourth Amendment violation and denying Tanguay's motion to suppress.

## III.

For the foregoing reasons, we <u>affirm</u> the district court's denial of Tanguay's motion to suppress the government's evidence.