COMMONWEALTH vs. GERALD F. DOWNEY.

Essex.    October 13, 1981. — December 11, 1981.

Present: GREANEY, CUTTER, & KASS, JJ.

*Extortion.   Practice, Criminal,* Instructions to jury, Argument by prose-
cutor.  *Pleading, Criminal,* Amendment to indictment or complaint.
*Evidence,* Wiretap.  *Words,* "Property."

A threat to prevent favorable action on an application for transfer of a
liquor license unless a bribe were paid was a threat to injure property
within the meaning of G. L. c. 265, § 25.  [756-759]
At the trial of an indictment charging extortion there was no error in
the judge's charge to the jury in defining property and in instructing
on reputation evidence.  [759-760]
Taken as a whole, the closing argument of the prosecutor at an extortion
trial was not prejudicial.  [760-761]
In the circumstances there was no error in allowing the prosecution in an
extortion case at the close of the Commonwealth's evidence to amend
the indictment to correct the middle initial of the victim. [761-762]
There was no error at the trial of an extortion case in admitting the testi-
mony of two witnesses about conversations with the defendant where
it appeared that the witnesses had an independent recollection of the
conversations and were not relying on tape recordings of the conversa-
tions which had been suppressed.  [762-763]

INDICTMENT found and returned in the Superior Court on
September 16, 1975.

The case was tried before *Sullivan,* J., a District Court
judge sitting under statutory authority.

*John J. Jennings* for the defendant.

*Stephen J. Kiely,* Assistant District Attorney, for the
Commonwealth.

KASS, J.  Although the defendant raises five issues in his
appeal from conviction of extortion under G. L. c. 265,
§ 25, the core of his defense is that extorting bribes to secure
favorable action by six members of the city council of Lynn

did not threaten "an injury to the . . . property of another."
G. L. c. 265, § 25. We reject this and several other argu-
ments which the defendant has advanced.

The case was tried to a jury and, taking the facts most
favorable to the Commonwealth, the jury might have found
that John G. O'Connell planned in 1975 to open a restau-
rant at 364 Lynnway in Lynn. To that end he executed a
ten-year lease conditioned upon obtaining a liquor license
for the premises. The lease provided for prepaid rent of
$3,840, $1,000 of which was to be retained by the lessor
should the license transfer condition not be realized. O'Con-
nell also entered into a written agreement to buy a liquor
license under which he made a nonrefundable payment of
$1,000 to be credited to the full purchase price at the time of
closing. Here again, however, performance by O'Connell
was conditioned upon approval of the license transfer.

Six days before the date established by the city council for
a public hearing on his license transfer application, O'Con-
nell received a telephone call from a man who did not iden-
tify himself, warning that the license transfer application
"could run into problems" but that "for certain considera-
tion these things could be taken care of." Another call came
on April 4, 1975, in which the caller demanded $7,500.
During the call he received on April 5, 1975, O'Connell
asked the caller if he would take $5,000. The caller replied,
in substance, that he was only a go-between. O'Connell
heard from the caller four times over the next two days;
dollars and guarantees were discussed; and the caller
claimed ability to deliver six favorable votes. In the last
call, the caller said that he was coming over to O'Connell's
house. A man who was the defendant Downey arrived at
around 11:00 P.M. O'Connell, who lived in Swampscott,
had meanwhile notified the police of that town. O'Connell's
lawyer notified the Lynn police. The Lynn and Swamp-
scott police departments cooperated in the investigation.
When Downey turned up at O'Connell's house, it was
under police surveillance inside and out. Indeed, there were
officers hidden behind a louvered wall off the first floor

kitchen and within a closet in O'Connell's second floor den. Conversation between Downey and O'Connell ensued in that den. O'Connell was prepared with a $7,500 registered check drawn on The First National Bank of Boston. This seems to have been a breach of bribing etiquette which angered Downey, who grumbled that he had wasted enough time. O'Connell asked for time until the next day to obtain cash. Shortly before midnight, Downey telephoned O'Connell again to tell him that the price had increased from $7,500 to $8,000 by reason of the irritation O'Connell had caused him. On Tuesday, April 8, 1975,[1] O'Connell spoke with Downey three times by telephone. In the last of those conversations Downey said he would pick up the money at O'Connell's front door at about 3:30 P.M. Downey appeared at 3:40 P.M. and was admitted to the O'Connell house. There O'Connell gave Downey currency in a bank deposit bag with which the police had provided him. Downey tucked the bag in his belt so that it would be covered by his outer coat and, as he was about to leave, a police officer emerged from a hiding place and arrested him.[2]

1. *The nature of property within the scope of G. L. c. 265, § 25.* So far as material to this case, G. L. c. 265, § 25, provides that "[w]hoever . . . by a verbal . . . communication maliciously threatens an injury to the . . . property of another . . . with intent thereby to extort money . . . shall be punished by imprisonment . . . ."[3] A license to sell alcoholic beverages, the defendant argues, is not a property right, nor should § 25 be read to reach intangible or in-

---

[1] This was the day O'Connell's application was to come before the city council. That body in fact unanimously approved the license transfer. We do not know from the record whether the vote occurred before or after the time of Downey's collection errand.

[2] We have omitted from the account of the facts the role of James F. Elliott, who had driven Downey to the O'Connell house on the two visits Downey had made there. The case against Elliott was dismissed for lack of prosecution and is not involved in this appeal.

[3] For the provisions governing solicitation of bribes by public officials, see G. L. c. 268A, § 2(b).

choate rights. While G. L. c. 138, § 23, provides that no holder of an alcoholic beverages license "shall have any property right in any document or paper evidencing the granting of such license" and it has been held that a liquor license conveys "no vested interest to the licensee," *Jubinville* v. *Jubinville*, 313 Mass. 103, 106 (1943), it has also been recognized that such a license is considered by purchasers as something of value. *Id.* at 107. See *Opinion of the Justices*, 368 Mass. 857, 863-864 (1975). This is because the number of liquor licenses available in a city or town is often finite and someone who requires an alcoholic beverages license is better off with the right to apply to the local licensing authority for a license transfer than someone with no rights at all. It is possible to acknowledge the power of the Commonwealth or a local licensing authority lawfully to revoke a liquor license without having to pay compensation, while nevertheless recognizing an asset value in possession of such a license. If a threat to devalue that asset by thwarting a transfer were not read as an injury to property, we should fail in our duty to construe the statute so as to make it an effectual piece of legislation. *Massachusetts Mut. Life Ins. Co.* v. *Commissioner of Corps. & Taxn.*, 363 Mass. 685, 690-691 (1973). *Shoolman* v. *Health Facilities Appeals Bd.*, 10 Mass. App. Ct. 799, 802 (1980).

The defendant relies heavily on *Carew* v. *Rutherford*, 106 Mass. 1 (1870), for the proposition that G. L. c. 265, § 25, does not reach threats to injure intangible business interests. That question was, however, not decided in the *Carew* opinion, which said of the progenitor of § 25,[4] "As this is a penal statute, *perhaps* it does not extend to a threat to injure one's business by preventing people from assisting him to prosecute it . . ." (emphasis supplied). *Id.* at 9. *Carew*, which was a civil case, was decided against the defendants on common law grounds.

---

[4] Gen. Sts., c. 160, § 28 (1860).

Courts of other States which have had occasion to construe similar extortion statutes have decided that they apply to threats to injure intangible business interests. *People* v. *Barondess*, 133 N.Y. 649 (1892), adopting dissenting opinion of Daniels, J. at 68 N.Y. Sup. Ct. 571, 581 (1891) (threat to induce employees from ending a strike). *People* v. *Wisch*, 58 Misc. 2d 766 (N.Y. Sup. Ct. 1969) (threat to cut off milk supply). *People* v. *Spatarella*, 34 N.Y. 2d 157, 161-163 (1974) (threat of personal injury if target of threat fulfilled a refuse disposal contract). *People* v. *Baker*, 88 Cal. App. 3d 115, 119 (1978) (threat made for the purpose of preventing the filing of a protest). See generally Vandevelde, The New Property of the Nineteenth Century: The Development of the Modern Concept of Property, 29 Buffalo L. Rev. 325 (1980).

Further support for the view that extortion statutes apply to threatened injury to intangible property appears in cases decided under the Hobbs Act, 18 U.S.C. § 1951 (1976),[5] a statute with a purpose similar to G. L. c. 265, § 25. So, for example, in *United States* v. *Hathaway*, 534 F.2d 386 (1st Cir.), cert. denied, 429 U.S. 819 (1976), the defense argued that a chance to obtain a personal service contract was not a property right. "Clearly some kind of 'property rights' would have to be involved, or otherwise there would be no motivation for the victim's acquiescence in the demands of the defendant. But a narrow perception of property rights or economic loss is misdirected." *Id.* at 395. See also *United States* v. *Tropiano*, 418 F.2d 1069, 1075-1076 (2d Cir. 1969), cert. denied, 397 U.S. 1021 (1970); *United States* v. *Santoni*, 585 F.2d 667, 673 (4th Cir. 1978), cert. denied, 440 U.S. 910 (1979); *United States* v. *Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980), cert. denied, 450 U.S. 985 (1981).

---

[5] The Hobbs Act provides that "[w]hoever in any way . . . affects commerce . . . by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section . . . ."

We ascribe no particular significance to the failure of the Legislature in 1979 to enact a bill (Senate Bill No. 772) which, among other things,[6] would have defined the word "property" as used in § 25 so as to include intangible personal property, "including rights, privileges, businesses, interests and claims . . . ." The practicalities of the legislative process are such that there may be many reasons for the failure of a bill to achieve enactment other than rejection of the principles put forward. *Franklin* v. *Albert*, 381 Mass. 611, 615-617 (1980), and cases and authorities cited.[7]

Since G. L. c. 265, § 25, has not previously been applied to intangible property in our cases, the defendant, relying on *Commonwealth* v. *Klein*, 372 Mass. 823, 833 (1977), argues the law as so construed should be applied only prospectively. We do not think that this is a case where the defendant was in ignorance of the possible criminality of his conduct so that subjecting him to the application of the statute is unfair. Cf. *Commonwealth* v. *Henson*, 357 Mass. 686, 690-694 (1970).

2. *Jury instructions*. In instructing the jury about what constitutes property, the judge read definitions from a dictionary of the English language and from a law dictionary. Those definitions included descriptions of intangible property, e.g., "Everything that has an exchangeable value or which goes to make up wealth or estate." He also instructed the jurors "that a liquor license is not property" but that "if one owns it, there is some value to that person." Prior to his instruction as to how a liquor license might be regarded, the judge had also said, "It's up to you to determine what property is." While this may have been inartistically ex-

---

[6] The bill dealt with the general subject of extortion, bribery and sports bribery and touched on provisions appearing in G. L. cc. 265, 268A and 271.

[7] Significantly S. 772, with amendments not here material, passed to be engrossed in the Senate and, after two readings, perished in the House in November without further action. Time may well have run out.

pressed, it is hard to see how the jury, in context, could have understood that single sentence as meaning other than that they must find whether property of O'Connell, as defined by the judge, had been threatened by the defendant. We must look at the charge as a whole and not take language out of context in assessing its probable effect on the jury. *Commonwealth* v. *McColl,* 375 Mass. 316, 321 (1978). *Commonwealth* v. *Mitchell, ante* 354, 356-357 (1981). Contrast *Commonwealth* v. *Glen, ante* 317, 320 (1981). The definitions which the judge read were not misleading and his charge on the nature of a liquor license as property was, if anything, favorable to the defendant.

The defendant expressly asked for an instruction on reputation evidence which had been received. In response, the judge charged as follows: "In the course of this trial there was testimony concerning the character and reputation of the persons. You have absolute right to consider that type, that evidence, whether it be favorable or unfavorable, that you consider the testimony to be about character if you're giving weight to the believability of witnesses." At a later point the judge said, "you have the right to consider the evidence given to you as to the character of Mr. Downey in wrestling with the overall subject of guilt or innocence." While it would have been better to cast the instruction to the effect that the jury may infer from reputation evidence that it is improbable that a person of such good character would commit the crime as charged, the charge as delivered satisfied the criteria of *Commonwealth* v. *Wilson,* 152 Mass. 12, 14 (1890), and *Commonwealth* v. *Simmons,* 383 Mass. 40, 42-43 (1981). See also *Commonwealth* v. *Beal,* 314 Mass. 210, 230 (1943). In any event, reputation evidence must have seemed particularly hollow to a jury obliged to consider the arrest of the defendant with the bribe money on his person, after having been seen and overheard by the police.

3. *Improper closing argument.* The defendant argues that the prosecutor misstated the evidence on five occasions

in his closing argument. In all five instances there was arguable support in the record, and four portions of the argument objected to were so neutral in quality that they were unlikely to prejudice the defendant; e.g., "[H]e tried to acquire a liquor license, a perfectly legitimate transaction in Lynn." No doubt adverse effect flowed from the prosecutor's statement that "Downey was the go between for the Lynn City Council, that's what he was. There were six members of that City Council waiting to be paid for their votes in this matter, and that's it. That is the truth of the matter." However, there was support for this characterization in testimony of O'Connell read into the record at trial (O'Connell died before trial and his testimony had been recorded at a suppression hearing). Thus the prosecutor's argument was not unfair. Taken as a whole, we do not think the argument was prejudicial "in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge." *Commonwealth* v. *Dougan*, 377 Mass. 303, 312 (1979). Contrast *Commonwealth* v. *Burke*, 373 Mass. 569, 574-576 (1977). At the beginning of his charge, the judge carefully and clearly explained that the jury were not bound by counsel's statements of the evidence in closing arguments.

4. *Motion for a required finding of not guilty.* As originally returned, the indictments named the target of the threats as John C. O'Connell. Evidence developed that his middle initial was "G," and the Commonwealth moved to amend the indictments.[8] The motion was allowed at the close of the Commonwealth's evidence. It was not necessary, as the defendant seems to suggest, to leave the middle initial deviation to the jury. Defendants "shall not be acquitted by reason of an immaterial misnomer of a third

---

[8] Coincidentally, there was some confusion about the middle initial of the defendant. Throughout the proceedings below he was referred to as Gerald F. Downey, including in documents filed by his counsel. For the first time, in the briefs on appeal, he is referred to as Gerald T. Downey.

party . . . ." G. L. c. 277, § 35. Ample evidence was placed before the judge enabling him to conclude that the man named in the indictment was the same man as the John G. O'Connell whom the police officers had described and who had himself testified at suppression proceedings. There was no suggestion that the defendant was in the slightest doubt as to who the O'Connell named in the indictment was. Thus it was appropriate, under Mass.R.Crim.P. 4(d), 378 Mass. 849 (1979), for the judge to allow the motion to amend the indictments. Compare *Commonwealth* v. *Snow*, 269 Mass. 598, 600-601, 607-610 (1930).

5. *Independent recollection of taped conversations.* Beginning with the second telephone call from the defendant, O'Connell took to making tape recordings of his conversations. The tapes were suppressed on the ground they were obtained through secret use of an electronic intercepting device. See G. L. c. 272, § 99, subparagraphs B. 3, B. 4 and P. See *Commonwealth* v. *Jackson*, 370 Mass. 502, 505-507 (1976). Compare *Commonwealth* v. *Thorpe*, 384 Mass. 271 (1981).

Both O'Connell and Lieutenant Hanley (of the Swampscott police) testified on the basis of their recollections; O'Connell as to his conversations with Downey; Hanley as to what he heard while tucked away behind a door in O'Connell's kitchen. The issue raised is whether O'Connell and Hanley testified from independent memory, or whether their testimony was contaminated by their having listened to the tape recordings. The judge who heard the suppression motion made careful findings and determined that O'Connell had an independent recollection of his conversations with Downey and that Hanley had an independent recollection of the conversation he overheard between Downey and O'Connell. Those findings we do not disturb in the absence of clear error. *Commonwealth* v. *Watkins*, 375 Mass. 472, 476 (1978), and cases cited. In *Commonwealth* v. *Jarabek*, 384 Mass. 293, 297-300 (1981), it was held that live testimony which is not the product of an unauthorized interception, but is independent of it, is

admissible. There was, therefore, no error in permitting Hanley to testify and permitting a transcript of the live testimony of O'Connell at the suppression hearing to be read to the jury at trial. See G. L. c. 233, § 80; P.J. Liacos, Massachusetts Evidence 272-273 (5th ed. 1981).

*Judgment affirmed.*