NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12693

COMMONWEALTH  vs.  RAUL MATTA.


Hampden.     May 9, 2019. - October 21, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Controlled Substances.  Parks and Parkways.  Constitutional Law,
    Search and seizure, Reasonable suspicion, Investigatory
    stop.  Search and Seizure, Threshold police inquiry,
    Reasonable suspicion.  Threshold Police Inquiry.  Practice,
    Criminal, Motion to suppress, New trial, Assistance of
    counsel.


    Indictments found and returned in the Superior Court
Department on December 17, 2015.

    A pretrial motion to suppress evidence was heard by Daniel
A. Ford, J.; the cases were tried before him; and a motion for a
new trial was considered by him.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Andrew P. Power for the defendant.
    Travis H. Lynch, Assistant District Attorney, for the
Commonwealth.
    Timothy St. Lawrence, for Michael Sanchez, amicus curiae,
submitted a brief.

Jason D. Frank, Vanessa M. Brown, & Chauncey B. Wood, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

BUDD, J.  The defendant, Raul Matta, fled when a police officer attempted to question him as a result of a tip received regarding a firearm in a motor vehicle.  After pursuing and arresting the defendant, police recovered a plastic bag containing heroin that the defendant had thrown onto a pedestrian walkway; several more small bags of heroin were found at the defendant's feet.  The defendant was charged with possession of heroin with intent to distribute (second offense) in violation of G. L. c. 94C, § 32 (b); and with committing the crime within one hundred feet of a public park in violation of G. L. c. 94C, § 32J (§ 32J), the "park zone statute."[1]  A judge in the Superior Court denied the defendant's motion to suppress the evidence, and the defendant was subsequently found guilty of each of the above offenses.  His motion for a new trial premised on ineffective assistance of counsel was denied by the same judge who had decided the motion to suppress and presided over the trial.

We transferred the defendant's consolidated appeal to this court on our own motion, and we now affirm the defendant's

---

[1] The defendant also was charged with resisting arrest, but that charge was dismissed on the defendant's motion for a required finding of not guilty.

conviction of possession of heroin with intent to distribute, reverse the denial of the defendant's motion for a new trial on the § 32J charge, and vacate the conviction of a violation of § 32J. In so doing, however, we conclude that intent to commit the underlying drug crime is sufficient to violate § 32J, without additional proof of scienter of park boundaries; further, we conclude that whether a particular location is a "park" pursuant to the statute is a matter for the fact finder to determine.

Background. For the purposes of the motion to suppress, we present the facts found by the motion judge supplemented by uncontroverted facts from the record. Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). On November 5, 2015, in the late afternoon, Holyoke police received two telephone calls from an unknown source indicating that the caller had observed someone place a firearm under the front seat of a black motor vehicle with two male and two female occupants. The motor vehicle was parked in an area of Holyoke known for violent crime, drug sales, and shootings.

Upon arrival, approximately three to four minutes after officers were dispatched to the scene, one of the officers observed a parked dark green Honda with two people inside. The officer, who was driving a marked cruiser, parked directly behind the vehicle without activating the lights or siren. As

the officer got out of the cruiser, he observed the individual seated in the passenger seat, later identified as the defendant, get out of the vehicle and reach with both hands to the right side of his body and adjust his waistband. The defendant thereafter began walking toward bushes that were away from the sidewalk. The officer then called out in substance, "Hey, come here for a second." At that point, the defendant made eye contact with the officer and immediately began to run. As the defendant ran, he held onto his waistband. The officer yelled out for the defendant to stop, and then gave chase.

As the defendant ran behind a nearby apartment building, he threw a plastic bag over a chain link fence approximately eight feet high onto a pedestrian walkway. The defendant was apprehended by multiple officers as he attempted to scale the fence, and the group fell to the ground. When the defendant was arrested, there were small wax baggies on the ground at his feet. The plastic bag retrieved from the other side of the fence also contained smaller wax baggies. One hundred twenty-nine baggies were recovered in total. A sample of the contents of the baggies was found to be heroin.

Discussion. 1. Motion to suppress. The defendant argues that the officer did not have reasonable suspicion to stop him, and thus his motion to suppress the narcotics seized as a result should have been allowed. See Commonwealth v. Franklin, 456

Mass. 818, 820 (2010) (evidence obtained as result of unlawful seizure is inadmissible).

"When reviewing the denial of a motion to suppress, this court accepts 'the judge's subsidiary findings of fact absent clear error and leave[s] to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing.' Commonwealth v. Contos, 435 Mass. 19, 32 (2001), quoting Commonwealth v. Eckert, 431 Mass. 591, 592-593 (2000). 'We conduct an independent review of the judge's application of constitutional principles to the facts found.' Commonwealth v. Hoose, 467 Mass. 395, 400 (2014)." Commonwealth v. Pinto, 476 Mass. 361, 363 (2017).

Article 14 of the Massachusetts Declaration of Rights provides that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions." An investigatory stop or "seizure" by police is justified under art. 14 if police have reasonable suspicion at the time of the stop to conduct it. See Commonwealth v. Phillips, 452 Mass. 617, 626 (2008), and cases cited. Thus, we must determine (1) at what point the stop occurred; and (2) whether the officer had reasonable suspicion for the stop at that time. Franklin, 456 Mass. at 820.

a. Seizure. Here, the defendant argues that the seizure occurred when the police officer called out, "[H]ey, come here

for a second," as the defendant began walking away from the officer.  The Commonwealth argues that the seizure occurred moments later, after the defendant began to flee, when the officer ordered the defendant to stop running away.  As explained infra, we agree with the Commonwealth.

i.  Standard.  "[N]ot every encounter between a law enforcement official and a member of the public constitutes [a seizure]."  Franklin, 456 Mass. at 820, quoting Commonwealth v. Lopez, 451 Mass. 608, 611 (2008).  We have long held that "[p]olice have seized a person in the constitutional sense 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.'"  Commonwealth v. Barros, 435 Mass. 171, 173-174 (2001), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).  See Florida v. Royer, 460 U.S. 491, 502 (1983).  See also Commonwealth v. Borges, 395 Mass. 788, 791 (1985).[2]  However, because civilians rarely feel "free

---

[2] In California v. Hodari D., 499 U.S. 621, 628-629 (1991), the United States Supreme Court distanced itself from the Mendenhall-Royer line of cases, holding that seizure requires more than a show of authority leading to a reasonable belief that one is not free to leave -- there must also be submission to that show of authority.  See United States v. Dubose, 579 F.3d 117, 121 (1st Cir. 2009), cert. denied, 562 U.S. 1016 (2010) ("when an officer makes a show of authority instead [of using physical force], the person is not seized until the person submits to the show of authority by complying with the officer's instruction").  In interpreting art. 14 of the Massachusetts Declaration of Rights, we have rejected the Hodari D. approach.

to leave" a police encounter, a true application of the test would result in nearly every police inquiry being deemed a seizure in the constitutional sense.[3]  See 4 W.R. LaFave, Search and Seizure § 9.4(a), at 580 (5th ed. 2012) ("[I]f the ultimate

---

See Commonwealth v. Stoute, 422 Mass. 782, 786-787 (1996).  See also Commonwealth v. Franklin, 456 Mass. 818, 821-822 (2010) ("seizure for art. 14 purposes may be effectuated by police conduct that falls short of the physical detention of the suspect").

We note, however, that Federal law has not abandoned the "free to leave" test entirely.  See Brendlin v. California, 551 U.S. 249, 254-255 (2007), and cases cited.  That is, in cases involving seizure via submission to a show of authority, the show of authority must still be evaluated through the Mendenhall-Royer standard.  See, e.g., United States v. Stover, 808 F.3d 991, 995-996 (4th Cir. 2015), cert. denied, 137 S. Ct. 241 (2016) ("If an interaction is not consensual, i.e., if a reasonable person would not have felt free to terminate it, then the Fourth Amendment guards against unreasonable seizures.  In such cases, however, the seizure inquiry does not end. . . . [A] court must also ascertain whether and when the subject of the seizure actually acquiesced to that authority").  See also United States v. Tanguay, 918 F.3d 1, 6 (1st Cir. 2019), and cases cited.

[3] "[O]ur law guards a person's freedom to speak or not to speak to a police officer.  A person also may choose to walk away, avoiding altogether any contact with police." Commonwealth v. Warren, 475 Mass. 530, 538 (2016).  However, although legally a person may be free to end a "voluntary" police encounter, in reality when an officer makes inquiry of an individual, he or she may not feel free to leave.  That is, the law on what constitutes an "objectively" coercive situation does not line up with empirical evidence on the matter.  See Kessler, Free to Leave?  An Empirical Look at the Fourth Amendment's Seizure Standard, 99 J. Crim. L. & Criminology 51, 73 (2009); Smith, Dolgoff, & Speer, Testing Judicial Assumption of the "Consensual" Encounter:  An Experimental Study, 14 Fla. Coastal L. Rev. 285, 304-305 (2013) (among participants in "consensual" police encounter, majority did not feel free to leave or did not know of right to leave).

issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure.  The Mendenhall-Royer standard should not be given such a literal reading as to produce such a result" [footnotes omitted]).[4]

A review of our case law reveals that rather than focusing primarily on whether a reasonable person would have believed that he or she was free to leave, we look at the totality of the circumstances to determine whether a member of law enforcement has "engaged in some show of authority" that a reasonable person would consider coercive; that is, behavior "which could be expected to command compliance, beyond simply identifying [him- or herself] as police" (quotation and citation omitted). Commonwealth v. Sanchez, 403 Mass. 640, 644 (1988).

---

[4] That the "free to leave" test is somewhat of a misnomer has not escaped the notice of courts.  See, e.g., United States v. Cardoza, 129 F.3d 6, 16 (1st Cir. 1997) ("We recognize, of course, the import of [the defendant]'s observation that few people . . . would ever feel free to walk away from any police question"); United States v. Tavolacci, 895 F.2d 1423, 1425 (D.C. Cir. 1990), citing Butterfoss, Bright Line Seizures:  The Need for Clarity in Determining When Fourth Amendment Activity Begins, 79 J. Crim. L. & Criminology 437, 439 (1988) (acknowledging criticism that "free to leave" test is "artificial" and "based on a false assumption that ordinary citizens believe they are normally free to cut police inquiries short"); People v. Spicer, 157 Cal. App. 3d 213, 218 (1984) (characterizing one's freedom to disregard police questioning and walk away as "legal fiction").

Thus, rather than attempting to determine whether a reasonable person would believe he or she was free to leave, in our view, the more pertinent question is whether an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay. See Barros, 435 Mass. at 175-176 (question is whether officer was "communicating what a reasonable person would understand as a command that would be enforced by the police power"). See also Commonwealth v. Sykes, 449 Mass. 308, 311 (2007), quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) (seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen").[5] If applied literally, the Mendenhall-

---

[5] The United States Court of Appeals for the First Circuit has also acknowledged the internal contradiction in the doctrine, and the court has adopted an inquiry that looks to whether the police officer objectively communicated that he or she is "exercising his or her official authority to restrain the individual's liberty of movement" (citation omitted). See Tanguay, 918 F.3d at 6, and cases cited; United States v. Cardoza, 129 F.3d 6, 16 (1st Cir. 1997). Under this approach, courts still look to the "totality of the circumstances" as interpreted through the "reasonable person," but with special attention paid to the officer's words and actions, and the message conveyed therein. See United States v. Ford, 548 F.3d 1, 5 (1st Cir. 2008), cert. denied, 558 U.S. 815 (2009). See also United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

*Royer* standard would require a court to treat "seizure" as a state of mind induced by the mere presence of law enforcement, rather than a discrete and intentional act of law enforcement. See Black's Law Dictionary 1631 (11th ed. 2019) (defining "seize" as "[t]o forcibly take possession [of a person or property]"). Cf. *California* v. *Hodari D.*, 499 U.S. 621, 625 (1991), quoting *Thompson* v. *Whitman*, 85 U.S. 457, 471 (1873) ("A seizure is a single act, and not a continuous fact"). Cf. also *Nieves* v. *McSweeney*, 241 F.3d 46, 55 (2001) (pretrial release conditions do not constitute seizure because seizure is "generally a discrete event, quintessentially an arrest, . . . or at least a physical detention"). In other words, while the attending circumstances of a police encounter are relevant, a "seizure" must arise from the actions of the police officer.

The question whether one believes he or she is free to walk away from a police encounter, as compared to whether one believes he or she would be coerced to stay, is not a distinction without a difference. Police officers are free to make noncoercive inquiries of anyone they wish. See *Commonwealth* v. *Murdough*, 428 Mass. 760, 763 (1999). And, as discussed in note 3, *supra*, although not legally obligated, few

---

As the First Circuit has stated, "Discerning such an objective communication of authority is easiest when the officer expressly asserts it through a command." See *Tanguay*, *supra*, and cases cited.

civilians feel as if they could discontinue an encounter with a law enforcement officer, let alone ignore an inquiry from one.[6] Indeed, the police depend on a degree of civilian compliance to maintain public safety and carry out criminal investigations. See Strange v. Commonwealth, 269 S.W.3d 847, 851 (Ky. 2008). In short, because, in most situations, a reasonable person would not believe that he or she was free to leave during a police encounter, using that standard does not produce the information necessary to determine whether a seizure has occurred. Rather, the inquiry must be whether, in the circumstances, a reasonable person would believe that an officer would compel him or her to stay.

Although this is a different question from what we heretofore have asked, the analysis takes the same circumstances into consideration. Whether an encounter between a law enforcement official and a member of the public constitutes a noncoercive inquiry or a constitutional seizure depends upon the facts of the particular case. See Sykes, 449 Mass. at 311, citing Commonwealth v. Thinh Van Cao, 419 Mass. 383, 387, cert. denied, 515 U.S. 1146 (1995) ("The nature of an encounter between a citizen and a law enforcement official is necessarily

---

[6] We note that those in doubt as to whether they are free to discontinue an encounter with the police may ask the officer at any point during the encounter if they are free to leave.

fact specific and requires careful examination of the attending circumstances"). The difference is one of emphasis -- that is, even though most people would reasonably feel that they were not "free to leave" in any police encounter, the coercion must be objectively communicated through the officer's words and actions for there to be a seizure. See Barros, 435 Mass. at 175-176.

ii. Application. Here, the police officer parked his cruiser behind the vehicle in which the defendant was a passenger. The two men got out of their vehicles in unison, and the defendant began walking away from the officer. As the defendant did so, the officer said, in substance, "Hey, come here for a second." The officer and the defendant "locked eyes for a moment," and then the defendant began running away. The officer instructed the defendant to stop, and then gave chase when the defendant failed to comply.

We begin with the initial attempt the officer made to engage the defendant. Although we have acknowledged the difference between questions and orders, see, e.g., Lopez, 451 Mass. at 610 ("A question is an inquiry; an order is a command. A question requests an answer, while an order demands obedience"), we never have held that a direct command from a police officer to submit to his or her authority automatically effects a seizure. Instead, we look to whether an officer has "communicat[ed] what a reasonable person would understand as a

command that would be enforced by the police power." Barros, 435 Mass. at 176.

Thus, we have concluded that no seizure has taken place when an officer got out of his marked cruiser and said to defendant, "Hold on a second, I want to talk to you." Commonwealth v. Martin, 467 Mass. 291, 301, 303 (2014). See Lopez, 451 Mass. at 610 (officer motioning at defendant to come to him and asking, "Can I speak with you?" was not seizure). In contrast, we have concluded that where a defendant chooses to ignore verbal attempts by police to speak with him, and officers persist by issuing a subsequent order, that subsequent order constitutes a seizure. See Jones-Pannell, 472 Mass. at 431 (after defendant failed to respond to police requests, officer called out, "Wait a minute"); Barros, 435 Mass. at 172 (after being ignored, officer got out of vehicle, walked up to defendant with two other officers and said, "Hey you. I wanna talk to you. Come here" [emphasis added]).

Here, the officer's words, "Hey, come here for a second," were not what "a reasonable person would understand as a command that would be enforced by the police power." Barros, 435 Mass. at 176. The record here shows that, at this point, the officer had made only one request, compare id., and had not activated any lights or sirens, compare Commonwealth v. Smigliano, 427 Mass. 490, 492-492 (1998), or otherwise intimidated the

defendant, compare Sykes, 449 Mass. at 311, 313.  Further, although the officer began walking toward the defendant, the officer did not "impede or restrict the defendant's freedom of movement."  Barros, supra at 174.  For that reason, we conclude that the defendant was not seized at the point at which the officer first called out to him.

The defendant was seized, however, once the officer ordered him to stop, and then chased him.  See Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981) ("a stop starts when pursuit begins").  See also Commonwealth v. Powell, 459 Mass. 572, 577-578 (2011), cert. denied, 565 U.S. 1262 (2012) (defendant seized when officer ordered him to drop his weapon); Barros, 435 Mass. at 176.

b.  Reasonable suspicion.  We turn next to whether the officer had reasonable suspicion to believe that the defendant "was committing, had committed, or was about to commit a crime" at the time of the seizure.  Martin, 467 Mass. at 303.  Reasonable suspicion "must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.'"  Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004).  "The facts and inferences underlying the officer's suspicion must be viewed as a whole when assessing the reasonableness of his acts."  Sykes, 449 Mass. at 314, quoting

Thibeau, 384 Mass. at 764. That is, "a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief that a person has, is, or will commit a particular crime" (quotation and citation omitted). Commonwealth v. Meneus, 476 Mass. 231, 236 (2017).

Based upon the judge's findings, at the time of the stop, the officer was aware of the anonymous tip regarding a concealed firearm in a motor vehicle in an area "known for violent crime, drug sales, and shootings." The officer, who had gotten out of his cruiser, observed the defendant get out of the automobile in which he was seated, adjust the right front area of his waistband with both hands, and walk toward some bushes "not on the sidewalk[,] where one would expect a person to walk." When the officer called out to the defendant, the two looked at one another, and then the defendant began to run. Although the question is a close one, we conclude that here the circumstances existing at the time of the stop provided reasonable suspicion for that stop.

We begin by noting that carrying a concealed firearm, by itself, is not a crime. DePeiza, 449 Mass. at 373. Thus, the caller's tip "suggesting a concealed firearm, with nothing more, [did] not provide reasonable suspicion for a stop."[7] Id., citing

---

[7] There were also issues with the reliability of the anonymous tip itself. See generally Commonwealth v. Mubdi, 456

Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996);

Commonwealth v. Couture, 407 Mass. 178, 183, cert. denied, 498

U.S. 951 (1990).  Compare Commonwealth v. Haskell, 438 Mass.

790, 793-794 (2003) (reasonable suspicion existed where

defendant was observed loading handgun shortly before 2 A.M. in

high crime area).

Similarly, the defendant's adjustment of his waistband

alone did not create reasonable suspicion for a seizure.  It is

not uncommon for anyone to adjust his or her clothing upon

getting out of a motor vehicle.  See generally United States v.

Gray, 213 F.3d 998, 1001 (8th Cir. 2000) ("Too many people fit

this description for it to justify a reasonable suspicion of

criminal activity").  However, the judge credited the officer's

---

Mass. 385, 395-396 (2010), quoting Commonwealth v. Lopes, 455
Mass. 147, 155-156 (2009); Commonwealth v. Depina, 456 Mass.
238, 243 (2010).  The caller reported that the firearm was in a
black vehicle with four occupants, including two females and two
males, with one of the females in the driver's seat.  The
caller's description of the vehicle varied, including a Honda, a
Toyota, and a vehicle with lights that flip up and down.  When
an officer arrived a few minutes following the caller's tip, he
found a dark green Honda with two occupants, one of whom
appeared to be a female in the driver's seat; the gender of the
individual in the passenger seat could not be immediately
ascertained.  Both individuals were in fact male; however, the
driver had a ponytail.  We note that although there were
discrepancies between the details provided by the anonymous
caller and the observations made by the officer upon arriving to
the area, police "must be allowed to take into account of the
possibility that some descriptive facts supplied . . . may be in
error" (citation omitted).  Commonwealth v. Emuakpor, 57 Mass.
App. Ct. 192, 198 (2003).

testimony that based upon the officer's experience, people who carry unlicensed firearms often carry them inside a waistband, and that the officer became concerned that the defendant was carrying an unlicensed firearm when the defendant adjusted the right side of his waistband using both hands.[8]

In addition, the officer's concern was heightened when the defendant "began walking towards bushes, not on the sidewalk where one would expect a person to walk," and, when the officer called out to the defendant, the defendant began to run away, holding his waistband as he ran. "[N]ervous or furtive movements do not supply reasonable suspicion when considered in isolation," DePeiza, 449 Mass. at 372; nor does seeking to avoid contact with police, Commonwealth v. Warren, 475 Mass. 530, 538-

---

[8] We note that ordinarily, when an officer relies on his or her training and experience to draw an inference or conclusion about an observation made, the officer must explain the specific training and experience that he or she relied on and how that correlates to the observations made. See United States v. Walker, 324 F.3d 1032, 1037 (8th Cir.), cert. denied, 540 U.S. 898 (2003); United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999). Here, the officer did not testify specifically that, in his training and experience, the adjustment of one's waistband in the way described indicates that the person may be carrying an unlicensed firearm. Compare Commonwealth v. DePeiza, 449 Mass. 367, 368, 373-374 (2007) ("As part of their training . . . officers had learned that [defendant's] distinctive 'straight arm' gait was one sign of a person carrying a firearm by pressing it against his body with the stiff arm"). However, as the officer testified that in his experience people carry unlicensed firearms in their waistband, the fact that the defendant clutched his waistband as he ran could be considered as part of the reasonable suspicion calculus.

539 (2016).  However, those details could be combined with the other circumstances present in this case in the reasonable suspicion calculus.  See, e.g., Sykes, 449 Mass. at 314, and cases cited.

The officer also properly could consider the fact that the encounter took place in a high crime neighborhood.  We have held repeatedly that "[j]ust being in a high crime area is not enough to justify a stop."  Commonwealth v. Grandison, 433 Mass. 135, 139 (2001).  However, the fact that a particular area is known for "violent crime, drug sales, and shootings," as was the case here, may be taken into account as a factor in the reasonable suspicion analysis.  See Commonwealth v. Johnson, 454 Mass. 159, 163 (2009).

Finally, although the defendant's flight from the officer is not enough on its own for an "individualized suspicion that the defendant was involved in [a] crime," see Warren, 475 Mass. at 538, it is a factor that may be considered in the reasonable suspicion calculus in appropriate circumstances.  See Sykes, 449 Mass. at 314.  Considered in isolation, none of the above factors would have been enough to create reasonable suspicion that the defendant had committed, was committing, or was about to commit a crime.  However, taken together, the circumstances presented added up to reasonable suspicion for an investigatory stop.  See DePeiza, 449 Mass. at 371-372.

2.  General Laws c. 94C, § 32J.[9]  As a result of throwing a bag of heroin over a fence onto what is known as Ely Pedestrian Walkway (walkway), the defendant was convicted of committing a drug offense within one hundred feet of a park (park zone) pursuant to § 32J.  The defendant makes three claims with respect to this conviction.  First, he argues that § 32J includes a scienter element as it pertains to the park zone provision and that the Commonwealth failed to prove the defendant knowingly violated the provision.  Second, the defendant argues that the walkway onto which he threw the heroin was not a park within the meaning of the statute.  Third, the defendant contends in a motion for a new trial that even if the walkway was a park under § 32J, it was incorrectly identified in the indictment as Ely Court Park, which is a separate tract of land not adjacent to the walkway, and that his trial counsel was ineffective for failing to raise the issue of variance of proof at trial.

After review, we conclude that with respect to the "public park or playground" provision of § 32J, the intent to commit the

---

[9] General Laws c. 94C, § 32J (§ 32J), commonly is known as the "school zone statute" because, as originally enacted in 1989, it punished certain drug offenses that occurred within a designated number of feet of a school zone.  See St. 1989, c. 227, § 2.  As discussed infra, the statute was amended in 1993 to include public parks and playgrounds.  See St. 1993, c. 335.

underlying drug crime is sufficient, without additional proof of knowledge of park or playground boundaries required.  We further conclude that whether an area of land is a public park under § 32J is a question of fact properly left to the fact finder.  Finally, we conclude that the defendant's trial counsel was ineffective with respect to failing to raise the variance between the park named in the indictment and the evidence presented at trial.

a.  Mens rea.  Section 32J provides in relevant part:

"Any person who violates the provisions of [§§ 32, 32A, 32B, 32C, 32D, 32E, 32F, or 32I][10] while in on, or within 300 feet of the real property comprising a public or private accredited preschool, accredited headstart facility, elementary, vocational or secondary school if the violation occurs between 5:00 A.M. and midnight, whether or not in session, or within [one hundred feet] of a public park or playground shall be punished by a term of imprisonment . . . .  Lack of knowledge of school boundaries shall not be a defense to any person who violates the provisions of this section."  (Emphases added.)

G. L. c. 94C, § 32J, as appearing in St. 2018, c. 69, § 57.[11] The original version of § 32J, enacted in 1989, referred to drug offenses committed on the property of or within a specified

---

[10] These sections of G. L. c. 94C, otherwise known as the Controlled Substances Act, govern the unauthorized manufacture, distribution, and dispensing of controlled substances, see §§ 32, 32A, 32B, 32C, 32D, and 32E, as well as sale to minors, see § 32F, and the sale of drug paraphernalia, see § 32I.

[11] Since the time of the defendant's alleged offense in 2015, § 32J was rewritten, see St. 2018, c. 69, § 57, but the provisions at issue here remain substantially unchanged.

distance of schools (school zones).[12]  See St. 1989, c. 227, § 2.
Not long after its passage, we confirmed that § 32J "comprises,
in part, an aspect of strict liability," Commonwealth v.
Peterson, 476 Mass. 163, 165-166 (2017), and that as such it did
not violate the due process clause, see Commonwealth v. Alvarez,
413 Mass. 224, 228-229 (1992).[13]  See also Commonwealth v.
Roucoulet, 413 Mass. 647, 650-651 (1992).

---

[12] Originally included were "public or private elementary,
vocational, or secondary" schools.  St. 1989, c. 227, § 2.  In
1998, § 32J was amended to include preschools and accredited
headstart programs.  St. 1998, c. 194, § 146.

[13] In concluding that § 32J did not violate the due process
clause, we pointed out that

> "§ 32J is not totally void of any mens rea requirement.
> Before a conviction can be obtained thereunder the
> Commonwealth must prove the defendant guilty of a predicate
> drug-dealing offense requiring mens rea -- in this case the
> possession of cocaine with intent to distribute.  Section
> . . . 32J thus imposes liability only on someone who knows
> he is dealing in drugs and requires the dealer to proceed
> at his peril with respect to the proximity of a school."

Commonwealth v. Alvarez, 413 Mass. 224, 229-230 (1992).

Further, we noted that § 32J is similar to "other criminal
statutes which punish an underlying violation committed with
mens rea and consider the offense aggravated by a fact of which
the defendant may not have express knowledge."  Id. at 230.  See
G. L. c. 269, § 12E (discharge of firearm within 500 feet of
dwelling; no requirement of knowledge of distance); G. L.
c. 94C, § 32E (increasing mandatory minimum terms based on
weight of controlled substances with no requirement of knowledge
of weight of substance).  But see Commonwealth v. Brown, 479
Mass. 600, 607-608 (2018) (Commonwealth must prove that
defendant knew that unlawful firearm was loaded with ammunition
for conviction under G. L. c. 269, § 10 [n], because unlawful
possession of ammunition is lesser included offense).

In 1993, when the Legislature amended § 32J to bar, in addition, drug offenses within park zones, the amendment did not alter the last sentence of the statute.  See St. 1993, c. 335.  The defendant contends that because § 32J explicitly bars "[l]ack of knowledge of school boundaries," but not lack of park boundaries, as a defense, we are to infer that a defendant therefore can assert the latter as a defense.  This position conflicts with the purpose of, and prior decisions interpreting, § 32J.

We begin by noting that the express inclusion of one thing does not imply the exclusion of another.  See Commonwealth v. Garvey, 477 Mass. 59, 65 (2017).  Thus, it is not necessarily the case that because § 32J specifically excludes lack of knowledge of school zones but not park zones as a defense to the statute, that the latter is an available affirmative defense.

Our holding that § 32J lacks a knowledge requirement with regard to school boundaries did not rest solely on the last sentence of § 32J.  Commonwealth v. Lawrence, 69 Mass. App. Ct. 596, 600 (2007).  See Alvarez, 413 Mass. at 229 ("Even in the absence of specific language such as the language that appears in § 32J, we have construed criminal statutes which authorize the imposition of serious sentences to permit conviction without proof of mens rea . . .").  In Roucoulet, we noted with respect to the school zone provision of § 32J:

"By its express terms, a violation is made out if a defendant is shown to have committed one of the enumerated acts that constitute crimes under G. L. c. 94C 'while in or on, or within' 1,000 feet of a school.  The quoted words are clearly meant to fix the location where the predicate crime must take place.  General Laws c. 94C, §§ 32A and 32E, which in relevant part make criminal the possession with intent to distribute cocaine, do not require for conviction that a defendant have an intent to distribute within any specific area.  Considered term by term, § 32J contemplates a violation in three instances -- when one of the identified drug crimes is committed (a) in a school; (b) on school property; or (c) within 1,000 feet of school property.  'After the elements of [the predicate] offense have been established, one need only take out the tape measure to see if [the school zone provision of § 32J] has been violated.'"

Roucoulet, 413 Mass. at 650-651, quoting State v. Ivory, 124 N.J. 582, 593 (1991).  The same reasoning pertains to the park zone provision of the statute, which applies when a drug violation occurs "within [one hundred] feet of a public park or playground."  G. L. c. 94C, § 32J.  That is, by the provision's plain language § 32J is violated any time one of the enumerated drug offenses occurs in that specified location.  No scienter requirement is stated or implied.  See Commonwealth v. LeBlanc, 475 Mass. 820, 821 (2016) ("Clear and unambiguous language is conclusive as to legislative intent").

This result is in keeping with the legislative intent of the statute.  "It is well settled, through legislative history and two decades of decisional law examining that history, that the purpose of G. L. c. 94C, [§] 32J, is to protect children from the harmful impact of drug dealing."  Commonwealth v.

Peterson, 476 Mass. 163, 168 (2017). Just as in the case of a school zone, the distribution of drugs within a park zone creates a potentially dangerous situation for children regardless of a drug dealer's knowledge or intent to do so in that location.[14] See Roucoulet, 413 Mass. at 651, quoting Ivory, 124 N.J. at 594-595 ("Clearly, the Legislature intended to create drug-free zones of safety where children could be, learn and play free of the potential infection of drugs. One contaminating these safety zones is liable, regardless of whether he or she intended to infect those here or others elsewhere").

Finally, we note that the argument proffered by the defendant already has been considered and rejected by the Appeals Court. In Lawrence, 69 Mass. App. Ct. at 600, the court held that the strict liability aspect of § 32J applies to preschools, concluding that "the Legislature properly forwent any element of scienter with respect to whether a defendant had

---

[14] The defendant points out that, in its original form, § 32J disproportionately affected urban communities resulting in racial disparities, and goes on to argue that construing § 32J to permit conviction without proof of mens rea is in contravention of the Legislature's intent to reduce those disparities. We disagree. In 2012, the Legislature amended § 32J to decrease the radius of the school zone from 1,000 feet to 300 feet specifically to address those disparities. See Commonwealth v. Bradley, 466 Mass. 551, 552 (2013). It made no other amendments to the statute in this regard; in particular, the Legislature left the mens rea requirement unchanged.

an intent to commit the predicate offense within any specific area." Although the Legislature has amended § 32J more than once since that time, it has not made any changes with regard to mens rea. See St. 2010, c. 256, § 72; St. 2012, c. 192, §§ 30, 31; St. 2018, c. 69, § 57. When interpreting the meaning of a statute, we presume that "as part of familiarizing themselves with the subject matter of the legislation, legislators became familiar with that pertinent precedent." See McCarty's Case, 445 Mass. 361, 380 (2005). As the Legislature declined to amend intent requirements within the section, we assume that it has adopted this construction of the statute. See Commonwealth v. Colturi, 448 Mass. 809, 812 (2007), citing Nichols v. Vaughan, 217 Mass. 548, 551 (1914).

b. Meaning of "park" within § 32J. The defendant also contends that the area where the heroin landed when he threw it, the walkway, is not a park as the term is used in § 32J.

Because § 32J does not define "park," we give the term its "usual and accepted meaning[]," as long as it is "consistent with the statutory purpose." Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977). "We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." Id. The term "park" is defined as "a tract of land maintained by a city or town as a place of beauty

or of public recreation."  Webster's Third New International Dictionary 1642 (1993).  See Commonwealth v. Campbell, 415 Mass. 697, 700 (1993), citing Zone Book, Inc., supra.  This definition is consistent with our use of the term in other legal contexts. See Salem v. Attorney Gen., 344 Mass. 626, 630 (1962) ("as used in modern and present times in America the term 'park' usually signifies an open or [e]nclosed tract of land set apart for the recreation and enjoyment of the public; or, in the general acceptance of the term, a public park is said to be a tract of land, great or small, dedicated and maintained for the purposes of pleasure, exercise, amusement, or ornament; a place to which the public at large may resort to for recreation, air, and light" [quotation and citation omitted]).  See also G. L. c. 45, § 1 ("In this chapter 'park' shall include a city or town common dedicated to the use of the public, or appropriated to such use without interruption for a period of twenty years").

Nothing in any of these definitions excludes pedestrian walkways, categorically or otherwise.  Nor does the purpose of the statute, i.e., to "protect children from the harmful impact of drug dealing," Peterson, 476 Mass. at 168, suggest the exclusion of pedestrian walkways.  See Commonwealth v. Mogelinski, 466 Mass. 627, 633 (2013), citing Wright v. Collector & Treas. of Arlington, 422 Mass. 455, 457-458 (1996) (statutory interpretation must be reasonable and supported by

purpose and history of statute). Indeed, to the contrary, the legislative purpose would be served by a broad definition of "park."[15]

We conclude that, as a walkway may be considered a "park" under § 32J depending upon the circumstances, it is for the jury to decide whether a tract of land is publicly owned or maintained and dedicated for enjoyment and recreational use by the public. We emphasize that, under this definition, the Commonwealth must prove not only that the tract was used by the public for recreation, but also that it was dedicated or set apart for such use. See Salem, 344 Mass. at 630. See also G. L. c. 45, § 1. Otherwise, every walkway -- including sidewalks, which are primarily intended for transportation rather than recreation, see, e.g., 350 Code Mass. Regs. § 5.01 (2001) (defining "sidewalk" as "[t]hat portion of a roadway or parkway . . . set aside for pedestrian travel") -- could potentially become a "public park" under § 32J. A less specific definition runs the risk of violating due process. See

---

[15] The defendant's argument that including pedestrian walkways as parks under § 32J would contravene the intent of the Legislature is misplaced. As we noted in Commonwealth v. Peterson, 476 Mass. 163, 168-169 (2017), the Legislature recognized "the statute's uneven impact on people who live in urban areas," and subsequently amended § 32J to reduce the school zone radius and to limit the time period in which a violation may occur. See St. 2012, c. 192, §§ 30, 31. However, the Legislature has not made any changes to the term "park" so as to exclude public walkways.

Commonwealth v. Sefranka, 382 Mass. 108, 110-111 (1980), and cases cited.

However, we do not require proving the elements of dedication for public use as we do in property law.  See, e.g., Longley v. Worcester, 304 Mass. 580, 588-589 (1939), and cases cited ("The owner's acts and declarations should be deliberate, unequivocal and decisive, manifesting a clear intention permanently to abandon his property to the specific public use").  Such proof is unnecessary given that the purpose of § 32J is to keep drugs away from certain public spaces, not to determine title.  Rather, the Commonwealth may prove that a tract is dedicated for public recreational use and enjoyment through circumstantial evidence, such as photographs of the tract, testimony from those who are involved with maintenance of the property, or authoritative maps referring to the tract as a "park."  Cf. Commonwealth v. Williams, 422 Mass. 111, 121 (1996) (conviction may be based on circumstantial evidence).  Conversely, the defense may argue that the tract is used by the public for recreational purposes by happenstance rather than the intent of the owner.[16]

---

[16] We note that the jury instructions on the definition of "park" were in accordance with our reading of § 32J.  The judge instructed the jury, "Now, I will tell you that the law . . . says the term park usually signifies an open or enclosed tract of land set apart for the recreation and enjoyment of the public.  Or in the general acceptance of the term, a public park

c.  Motion for a new trial.  Finally, the defendant filed a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), claiming, as relevant here, that his trial counsel failed to challenge adequately the park zone charge.  More specifically, the defendant argued that because Ely Court, the park named in the indictment, is different from the walkway, the area where the defendant tossed the drugs, he was convicted of a crime for which he was not indicted, and his trial counsel was ineffective in failing to raise the issue at any point prior to, or during, the trial.  We agree.

At the evidentiary hearing on the motion for a new trial, it was established that Ely Court Park and the walkway are distinct, nonadjacent tracts of land separated by a distance of more than one hundred feet.  The walkway comprises the last third of Ely Street and is perpendicular to Bowers Street.  Ely Court Park, on the other hand, sits at the corner of Center Street and Lyman Street and contains a basketball court.

Trial counsel was aware that the distance between where the tossed drugs were found and Ely Court Park was greater than one hundred feet, and personally observed that the two areas were

---

is said to be a tract of land, great or small, dedicated and maintained for the purposes of pleasure, exercise, amusement, or ornament.  A place to which the public at large may resort to for recreation, air, and light."

not contiguous but were instead more than one hundred feet apart. He failed to raise the issue, however, assuming that the walkway was nevertheless part of Ely Court Park. Trial counsel further reasoned that, in any case, had he raised the matter by way of a motion to dismiss, the Commonwealth likely would have moved, and received permission, to amend the indictment to name the walkway rather than Ely Court. Trial counsel believed that naming the location of the offense in the indictment was mere "surplusage," and unnecessary to describe the crime. As detailed infra, we conclude that trial counsel's strategic choices with regard to defending against the § 32J charge were manifestly unreasonable.

First, we disagree with the motion judge that trial counsel "reasonably concluded" that the walkway was part of Ely Court Park even though the two parcels are not adjacent to one another. Further investigation into the boundaries of Ely Court Park would have shown that the walkway was indeed separate; according to testimony at the hearing, this information was readily available online.

With a correct understanding of the boundaries of the two parcels, trial counsel would have had at least two possible options to pursue. First, he could have moved to dismiss the indictment prior to trial. Even if the Commonwealth had re-

indicted the defendant to name the correct location,[17] counsel could have mounted a viable defense to the § 32J charge by arguing that the walkway did not meet the definition of a park within the meaning of the statute. See part 2.b, supra. Although the Commonwealth presented evidence that the walkway was owned and maintained by the Holyoke parks and recreation department, and the photographs of the walkway introduced at trial depict a paved walkway surrounded by trees and grass, there was no direct evidence on the intended use of the walkway -- that is, no testimony or documentation showing that the park was dedicated to public recreational use, or even that members

---

[17] Alternatively, an amendment to the indictment in this case would have been improper. An indictment may be amended "if the amendment is one of form, not substance"; "if the amendment will not result in prejudice"; and pursuant to art. 12 of the Massachusetts Declaration of Rights, as long as such amendment does not "materially change[] the work of the grand jury" (quotation and citations omitted). Commonwealth v. Miranda, 441 Mass. 783, 787 (2004). See Mass. R. Crim. P. 4 (d), 378 Mass. 849 (1979). A motion to amend would have been appropriate if the indictment incorrectly referred to the proper parcel by, for example, using its former name, or misspelling the name. See G. L. c. 277, § 35 (defendant "shall not by acquitted by reason of . . . an immaterial mistake in the description of the property or the ownership thereof"). See also Commonwealth v. Downey, 12 Mass. App. Ct. 754, 761-762 (1981) (amendment to middle initial of third party's name was immaterial and thus not in error). Here, because the grand jury handed up an indictment for a § 32J violation specifically with respect to Ely Court, amending the indictment to indicate a different tract of land would have been an amendment of substance rather than one of form. See Commonwealth v. Snow, 269 Mass. 598, 608-610 (1930) (although name of victim was not essential element of extortion charge, where such person is specifically named in indictment by grand jury, amending name is impermissible).

of the public actually used the walkway for such purposes.
Trial counsel could have drawn attention by way of cross-
examination and argument to the aforementioned weaknesses in the
Commonwealth's evidence.

Another option would have been for trial counsel to have
moved for a required finding of not guilty at the close of the
Commonwealth's case based on the variance between the
allegations in the indictment and the proof at trial. As
discussed supra, although the indictment names Ely Court as the
location of the crime, all of the evidence presented pertained
to the walkway. It is true that "[a] defendant is not to be
acquitted on the grounds of variance between the allegations and
proof if the essential elements of the crime are correctly
stated, unless he is thereby prejudiced in his defence." G. L.
c. 277, § 35. See, e.g., Commonwealth v. O'Connell, 432 Mass.
657, 660-661 (2000) (no prejudice to defendant where victim is
not mentioned by name in indictment, but is mentioned by name at
trial). However, here, a material element of the crime is that
the underlying drug offense took place within one hundred feet
of real property used as a public park or playground. Although
there is no real question regarding whether Ely Court Park was a
park within the meaning of § 32J, as discussed supra, the same
cannot be said for the walkway. Thus, the fact that the
location was not correctly identified in the indictment was a

material inaccuracy.  See Commonwealth v. Barbosa, 421 Mass.
547, 552-554 (1995) (Commonwealth presented evidence of two drug
transactions, but ambiguity in indictment as to which
transaction formed factual basis of charge required reversal of
convictions).  See also Commonwealth v. Ohanian, 373 Mass. 839,
843 (1977) (conviction of larceny for obtaining money by means
of checks drawn against insufficient funds reversed where
indictment incorrectly named bank and defendants had no reason
to know about sufficiency of funds at named bank).  This is
especially true where, as here, the indictment naming the wrong
location was attached to the verdict slip and was sent into the
jury room during deliberations.  Thus, the jury were asked
whether the defendant was guilty of possessing drugs within one
hundred feet of Ely Court, but they heard evidence only about
the walkway.

There would have been no downside to challenging the
variance between the indictment and the evidence.  We conclude
that trial counsel's failure to do so was manifestly
unreasonable and deprived the defendant of one or more viable
defenses.  See Commonwealth v. Acevedo, 446 Mass. 435, 442
(2006), citing Commonwealth v. Adams, 374 Mass. 722, 728 (1978);
Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

The usual remedy for ineffective assistance of counsel is a
new trial.  Here, however, counsel was ineffective in failing to

challenge the sufficiency of the evidence regarding an essential element under § 32J -- the proximity of the underlying offense to a particular public park.  There was no evidence that the defendant's possession of heroin with intent to distribute occurred within one hundred feet of Ely Court, the location named in the indictment as the public park for the purposes of § 32J.  Where an amendment of the indictment at trial to identify the correct park would have been improper, see note 17, supra, and where the Commonwealth presented no evidence at trial showing that the defendant committed the underlying drug offense within one hundred feet of Ely Court, the evidence was insufficient as a matter of law, and the conviction must be dismissed with prejudice.  See Commonwealth v. Merry, 453 Mass. 653, 660 (2009), citing Corson v. Commonwealth, 428 Mass. 193, 201 (1998) ("Where the evidence at the first trial was legally insufficient to sustain a verdict, a new trial would violate the prohibition against double jeopardy and is therefore impermissible").

Conclusion.  For the reasons stated supra, we affirm the judgment of conviction of possession with intent to distribute heroin.  However, the denial of the defendant's motion for a new trial on the § 32J charge is reversed, the judgment of conviction on the indictment charging the defendant with the

§ 32J violation is vacated, the jury verdict is set aside, and judgment shall enter for the defendant.

So ordered.